## J. S. MOON *v.* THE STATE.

### (*Nashville.* December Term, 1921.)

1. **HOMICIDE.** Evidence held to support conviction.

   Evidence *held* sufficient to sustain a verdict finding defendant guilty of murdering his wife, who, defendant claimed, committed suicide. (*Post, pp.* 322-365.)

   Cases cited and approved: Telephone & Telegraph Co. v. Mill Co., 129 Tenn., 374; State v. Perry, 41 W. Va., 650; State v. Lee, 65 Conn., 208;

2. **CRIMINAL LAW.** Opinion of expert that wound could not have been self-inflicted held properly admitted.

   On a trial for murder, the jury were not as well qualified as a doctor who examined deceased's body, the bullet wounds thereon, and the courses and exits of the bullets, and was accustomed to examining such wounds and familiar with the various organs of the body, to determine whether the wounds could have been self-inflicted, and he was properly permitted to express his opinion that they could not have been. (*Post, pp.* 365-368.)

3. **CRIMINAL LAW.** Motion to exclude evidence may be made at any time before jury's retirement.

   A party adversely affected by the introduction of incompetent testimony may move to have it excluded at any time before the jury retires, provided he has not waived his right to have it withdrawn. (*Post, pp.* 368-370.)

   Cases cited and approved: Price v. Allen, 28 Tenn., 703; Creed v. White, 30 Tenn., 549; Carper v. Barnes, 36 Tenn., 452; Birchfield v. Russell, 43 Tenn., 229.

   Case cited and distinguished: Mahon v. State, 127 Tenn., 555.

4. **CRIMINAL LAW.** Judicial notice not taken of ability of wounded person to fire another shot.

Moon v. State.

Though an authority on medical jurisprudence states that one receiving a wound in the heart may live for some time, the court cannot judicially know that a person so wounded possessed sufficient consciousness and physical control of his hand to fire a pistol, and hence testimony that she could not fire another shot is not inadmissible as contrary to facts of which the courts take notice. (*Post, p.* 370.)

5. CRIMINAL LAW. Expert may testify as to whether person shot through the heart could have fired another shot.

On the issue of murder or suicide a doctor having superior knowledge of anatomy and of the effects of wounds could express his opinion that deceased, after being shot through the heart, could not have fired another shot; this being a matter as to which a layman, as a rule, is ignorant. (*Post, p.* 370.)

6. CRIMINAL LAW. Admission of evidence held harmless because uncontradicted evidence showed murder rather than suicide.

On the issue of murder or suicide, where the evidence showed deceased was shot twice through the heart, and an expert testified in effect without contradiction that after receiving one of such wounds she could not have fired another shot, the admission of evidence as to possibility of self-infliction of the wounds in view of their location and courses was not prejudicial, as on such uncontradicted evidence, defendant was necessarily guilty. (*Post, p.* 370.)

7. CRIMINAL LAW. Admission of subpœna issued for an absent witness who had died held not prejudicial.

The admission of supœna issued for an absent witness who had died was not prejudical as importing an insinuation that her testimony would have been injurious to defendant, where defendant admitted that he obtained a pistol from the deceased witness by falsely stating that her husband sent him after it, and there was nothing to indicate that she would have given any other evidence. (*Post, pp.* 370-272.)

8. CRIMINAL LAW. Defendant's statements some time after shooting of wife not admissible as res gestæ.

Moon v. State.

Where defendant after the murder or suicide of his wife went to a bridge and jumped off, and was taken to a hospital in an ambulance, a statement to the ambulance driver some time after the shooting that the wife shot herself was not admissible as *res gestae*. (*Post*, p. 372.)

9. CRIMINAL LAW. Defendant's self-serving statements when not fully conscious held not admissible.

Under no rule of evidence were defendant's self-serving declarations admissible if made while he was unconscious or only semiconscious. (*Post*, p. 372.)

10. CRIMINAL LAW. Defendant's statement that his wife shot herself inadmissible as self-serving.

Defendant's statement that his wife shot herself was incompetent as a self-serving declaration if made when he was conscious. (*Post*, pp. 372, 373.)

11. CRIMINAL LAW. Newly discovered evidence on immaterial point held not to require new trial.

Though there was a dispute in a murder case as to where the shooting took place, where this was wholly immaterial, newly discovered evidence as to the hearing of pistol shots at the place claimed by defendant did not require a new trial. (*Post*, pp. 373-375.)

12. CRIMINAL LAW. Failure to charge on circumstantial evidence not error when there is evidence of confssion.

Where there was positive evidence of a confession by defendant that he killed his wife, supported by circumstantial evidence, the failure to charge the law of circumstantial evidence was not error. (*Post*, p. 375.)

Case cited and distinguished: Barnards v. State, 88 Tenn., 183.

---

FROM SHELBY.

---

146 Tenn.—21

Error to the Criminal Court of Shelby County.—HON. J. ED. RICHARDS, Judge.

A. B. GALLOWAY, JNO. E. BALL and L. B. PHILLIPS, for plaintiff in error.

FRANK M. THOMPSON, Attorney General for the State.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

The plaintiff in error, J. S. Moon, hereinafter referred to as the defendant, was convicted in the criminal court of Shelby county of murder in the first degree for killing his wife, Drew Foster Moon on Wednesday afternoon, August 24, 1921, with a pistol, and his punishment was fixed at death by electrocution.

The defendant has appealed to this court, and has assigned ten errors, the first three of which question the sufficiency of the evidence to sustain the verdict of the jury.

The defendant on the afternoon of the killing and at the time of the killing was riding with his wife in his automobile, and he insists that his wife committed suicide by shooting herself with a pistol; while the State contends that the defendant shot and killed his wife.

The defendant was a taxicab driver, and was associated with W. C. Williams and Doc Davis in the taxicab business in Memphis, their stand being in front of the Union Station. He was twenty-three years of age, and was married to the deceased in June, 1919. He testified that he cohabited with his wife for several months prior to their marriage, but this is not at all certain from the record, and whether he did or did not in no wise affects the issue here involved.

The deceased was twenty-five or twenty-six years of age. For some months prior to the homicide they had been making their home with Mrs. J. M. Rand, a sister of the deceased, at 784 St. Paul street in Memphis. For eight days prior to the killing the parties had not lived together, but he visited her and took her driving on several occasions during this period. They evidently had not lived together harmoniously, and the evidence discloses that in February, 1920, the defendant packed his belongings with a view of abandoning his wife, and as he was leaving the house with his things his wife entered the bathroom and took bichloride of mercury tablets. She was rushed to the hospital and her life was saved.

Mrs. Rand testified that she understood from the deceased that the defendant had knocked her down and had torn the telephone from the wall, whereupon deceased ran to the bathroom and attempted to commit suicide in the manner indicated.

Shortly after this the parties renewed their marital relations.

It is apparent from the record that the deceased was very fond of the defendant, while, on the other hand, the evidence indicates that the defendant was tired of the deceased and was probably infatuated with some other woman.

Some six weeks prior to the murder the deceased had visited St. Louis for a week and returned to Memphis, where she remained for three weeks, and then made a short visit to Marion, Ill. Upon her return from Marion, about eight days before her death, the defendant carried her home in his car, but refused to live with her.

On Sunday, preceding her death on Wednesday, she wrote the defendant the following letter:

"Sunday. Dear Cookie: It sure has been a lonesome old Sunday. Just do you remember what we were doing a week ago to-day? But probably you had a picnic to-day. Guess you, Charlie, and your sweetheart sure did enjoy yourself. I tried to get you all day, but you were too busy then. Oh, well, I guess I have had my good time with you, so I will have to let you have her. You told me she got married, but this one you loved. The one that beat my time is not married. That's the reason you left me. Tell her I said to watch her step, because if I ever do catch her —well. I have an invitation to a picnic to-morrow. Hope you enjoyed yourself, too, Sunday, I sure didn't. How is Sugar? Wish you would let me have him—won't you? Be good, and, most of all, be careful, and blow the dust out of it. I am sure lonesome.

"[Signed] Nobody's Baby Tots."

It is the theory of the State that the defendant became infatuated with a woman by the name of Mrs. Bessie Lee Odle, or some other woman, and that he deliberately planned to kill his wife so that she would not be in his way.

Mrs. Odle testified that she was twenty-one years old and married; that her husband's name was Allen Odle, and she had lived in Memphis all of her life. Said in August, 1921, she lived on Court street and other places. Met the defendant on Saturday and met him three times altogether. Said she met him on Saturday, Sunday, and Monday; that she knew him three days prior to the killing; that she saw him in the courtroom; that she first saw him on Adams street; that on this occasion she and the defendant went driving; went out to the pig stand on the Speedway; it

Moon v. State.

was neither night nor day; it was about 7 o'clock on Satur-
day evening or something like that; that during that time
of the year and in that month it was still light at 7 o'clock;
that the automobile they were in was supposed to be de-
fendant's, and that defendant was driving the car; that
there was no one else in the car. Said she went on this
drive at the request of the defendant.

That while they were riding they had a conversation
relative to her marital affairs and his difficulties with his
wife.

That defendant said his wife was out of the city and he
was not living with her, and that he was not intending
to live with his wife any more; that he had bought her all
kinds of nice clothes and diamonds; that he had bought
her some nice diamonds, and she made a stud for a Dago
that she was living with; that she was living with some
man he understood, and, if she ever bothered him any
more, he intended to kill her.

When asked what words he used, she stated that that
was all he said; that he was going to kill her if she ever
came around him any more; that he intended to kill her.
Said the next time she saw the defendant was on Sunday
night; she met him on Sunday night about 8 o'clock. Said
she was on Court street and he was in his automobile; that
they went out driving that night; there was no one with
them on that night; "we went by ourselves." She was
asked if there was any statement made about his differ-
ences with his wife on that occasion, and said he talked
about it that night while we were out; he said the same
thing on that night that he did the night before about kill-
ing his wife.

Said he did not say anything about the place where he was going to kill her. Said the next time she saw the defendant was on Monday night. Said he came by the house, and there was a man by the name of Charlie and another girl by the name of Nell in the car. Said she did not know who Charlie was except by hearing Moon call him by that name.

Said: "I think he was a roommate of Moon's, and there was nothing said on that night. We only went out hunting for an Airedale dog belonging to Nell. I never went riding with him any more after that. On the first night I went riding there was something said about a divorce. He said something about killing his wife, and I said it would be easier to get a divorce from her, and that is when he said something about killing his wife. I said there was an easier way than that. He said he would get a divorce, and he said, 'Are you going to live with your husband any more?' and I said, 'I do not think I am,' and I said, 'I am going to get a divorce, too,' and he laughed it off, and said, 'Well, we will marry.' Of course, I had no intention of marrying him. We were just out on a pleasure ride. I did not know his wife. I never had met his wife. I heard defendant say he would kill his wife just twice."

Said: "He said something about Arkansas; said something about a lake or something like that; I am not sure he said he would throw her in the lake or river; I am sure he said something about that, but I am not sure whether he said the lake or the river."

Remont M. Bowers testified that he worked for the Memphis Packing Corporation and was a butcher; had known Moon about ten days prior to the killing; had lived at 670 Rayburn avenue, and defendant also lived there at that

time; that witness went out riding with defendant on the night prior to the killing; that a request or statement was made to witness by the defendant relative to borrowing a gun from witness. Said that—"While out riding with Mr. Moon and Mr. Shaughn on the evening of the 23d of August Mr. Moon asked if I had a gun, and I told him 'No,' and he asked me if I knew where I could borrow a gun, and I said 'No,' and I became suspicious and asked him what he wanted with it, and he said he was going to the place where his wife was staying and take her out on the bridge and kill her."

He further testified that Mr. Robert Foster, brother of deceased, was credit man for the Memphis Packing Corporation.

Charles F. Shaughn testified that he was a sausage maker and employed by the Memphis Packing Corporation in August, 1921; knew the defendant Moon and had known him for about two months; that he heard or read about the killing that day; that at the time he was a roommate of defendant's at 607 Rayburn avenue; that on the night before the killing he went driving with defendant and a man by the name of Wheatley and witness' brother. He was then asked this question:

"Q. I will ask you whether or not during the occasion of that ride you heard the defendant make any reference to his wife"—and answered: "Well, he spoke about his wife. She was also in the car with us for a while. She left us out. He said he loved his wife, and if he ever saw her with a man he would kill her. I heard him make that statement only once. She was not in the car at the time."

The defendant admitted this conversation with Shaughn, except that he claims to have stated to Shaughn that if

he ever saw his wife with a man that he would kill the man, and not his wife.

W. C. Williams testified that he was in the taxicab business with the defendant and Davis, and had known the defendant for a year and a half. Said the stand was located on Calhoun street opposite the Union Station, and remembered the day that Mrs. Moon was killed.

That prior to the killing and in the forenoon of that day he had a conversation with the defendant; that he came to him and wanted to borrow a pistol. Said:

"Mr. Moon came to me and asked me to loan him my pistol. ' He and his brother, it seems, were going on a fishing trip—at least, that is the way it was put to me—and wanted to borrow a gun to take along for target shooting, and I told him I could not let him have it. He offered to make a deposit, and I told him if I loaned him the gun at all I would not require it, but I did not want him to have it at all. I refused to let him have it. It is a .38 Smith & Wesson, 4-inch barrel."

Said: "It was a blue steel gun, and I refused absolutely to let him have the gun. My wife was at home that day. I can't say what time I went home that day, for there was nothing occurred to make me note the time. I very often went home through the day several times on account of my wife's condition. When I got home, I did not inquire for my gun. When I got home the first thing my wife said to me was—she called me in the room—when I came home my wife asked me if I sent Moon for my gun."

This statement was objected to by defendant, and the court sustained the objection.

Witness said he did not find his gun at home; that he did not look for it, as it was not at home. Said he did not dis-

pose of it or loan it to any one himself. Said the last time he saw it, it was at the house; that he never saw Moon in possession of a pistol.

Said he never saw a pistol in the pocket of his (defendant's) car; that his (witness') wife was dead, she having died on the morning of the 28th, which was on last Thursday.

The witness was recalled by defendant, and the pistol was handed to him, and he identified it. Said he was a partner and associate of the defendant at the Union Taxicab Company. Was then asked:

"I will ask you whether or not immediately preceding this tragedy, for a few days prior to that time, Mr. Moon's wife frequently called him over the phone endeavoring to have a conversation with him over the phone"—to which he replied: "I called him to the phone several times when his wife would call."

On cross-examination witness could not say whether defendant called his wife several times or not. Said:

"He would go in there and use the phone, and I could not say what phone he would call; it was a little booth."

Said he did not send him to his house to get the pistol; in fact, told him he would not loan him his pistol.

The defendant admitted that he went immediately to the home of Williams and obtained the pistol from Mrs. Williams upon the statement to her that Mr. Williams said for her to turn it over to him.

The evidence shows that defendant knew when he asked Williams for the pistol that he was going direct to his wife, and it further appears that upon obtaining said pistol he went immediately to the home of his wife.

Mrs. Rand testified that she lived at 784 St. Paul street and was a sister of the deceased. Said that prior to her death her sister lived with witness on St. Paul street; that she lived there with her (witness') husband and little child since last March; that deceased had been living with her ever since witness moved to Memphis, four or five years before. Said deceased and defendant lived with her ever since they were married; that he had not been there for something like a week prior to the killing. Said:

"I do not mean he had not been in the house; I mean he had not been living there. They had been living with me since they were married. They were married in June two years ago, but I could not give you the exact date; I was not present when the ceremony was said."

Said: "Deceased left my house at 1:30 on the day of the killing, and she was in good health and spirits, and we had an engagement to go to my sister's, Mrs. Herbert Foster, to a party the next day. Deceased had bought a new dress to wear to the party."

Said defendant came there that morning about 10 o'clock or a little after 10; that he was there that morning.

Said: "Just before she went away she came in and told me that defendant was in the room, lying across the foot of the bed; that she was fixing to go out and slipped on her dress and fixed her hair, and she asked me if I would go with them, and I said I was not dressed; that defendant heard this conversation. She asked me would I go, and I said I was not dressed, and she said she was only going around the block, and when she started out again she said, 'You had better come and go,' and I said 'No; I will not go,' and she said, 'Is there anything you want for dinner,' and I said 'I have everything, Tots, everything

except meat.' When I say 'Tots' that was a nickname I had for her, and she said she would get some meat and asked what kind I wanted, and asked if veal chops would do, and I said 'Yes,' and I offered to give her some money, and she said, 'I have a little money,' and when they both started out she said, 'You had better come and go,' and Mr. Moon said, 'Sweet, I am only going to take her around the block.' He called me 'Sweet,' and I called her 'Tots.' "

Said: "I did not consider that an invitation for me to go. They had been inviting me to go; previously they had both been in the habit of inviting me to go with them riding. The intention was to go and get some meat and bring it back for dinner, not the noon meal; I had my dinner in the evening. She left the house in company with the defendant. I did not see the car but he came in a car, and I suppose he left it out in front. I live upstairs, and I did not see the automobile."

Said: "Moon came to my house at 10 o'clock or probably a little after. When he first came he asked deceased if she was not going to Raleigh swimming with him; he wanted her to go swimming with him."

"She said she was not feeling well enough to go. While they were there, we all three engaged in conversation. I went into the room where they were. Their door was open. It was a small apartment."

Then this occurred: "Q. I will ask you whether or not the defendant, Moon, in the course of his conversation with you and your sister asked you as to the location of a person's heart in the body.

"A. Yes, sir; he asked me. We discussed the size of the heart and what it looked like, and he turned to me and asked me where it was, and I illustrated by saying the

heart was this shape, and my little sister said it was there, and we discussed it a little further, and in the conversation he asked me where the heart was, and I said, 'Just left of the left nipple,' and I left in the course of the conversation, and said I did not believe anybody has got any heart these days, and we were all in friendly conversation, and we had talked about other things that morning, while we were in the room together."

Said: "When defendant was present, my sister asked two or three times for me to go with her, and then finally turned and said, 'You had better come and go.' Moon did not at any time ask me to go."

The defendant and his wife left Mrs. Rand's home in his car at about 1:30 or 1:45 in the afternoon, and they were not seen by any of the witnesses from that time until somewhere in the neighborhood of 3 o'clock, when the defendant drove his car upon the Tennessee side of the Harahan bridge, which spans the Mississippi river, stopped it, got out, climbed over the rail of the bridge, and jumped into the river, a distance of about one hundred and twenty-five feet. He was rescued and was apparently uninjured. His wife's dead body was in the back end or the tonneau of the car on the floor.

The excuse offered by the defendant for refusing to live with his wife after her return from Marion was that upon her return he discovered that she was using morphine, and he also discovered that she was in love with another man. His testimony as to these matters is as follows:

"My wife and I had been separated like seven or eight days before her death. Before we separated, she went three weeks on a trip to Chicago. She had gone to St. Louis for a week and came back and stayed here in Mem-

phis with me about three weeks and then went to Marion, Ill., just this side of Chicago. We lived at 784 St. Paul street with Mrs. Rand. We had had trouble prior to our separation. Since she came back from this trip to Marion, the first time I noticed her being an addict to morphine was the morning she came back. I was at the office on Calhoun street, right across from the Union Depot, and either she or her sister called me up at the office, I don't know; I think they wanted to surprise me. They did not tell me who it was, but they said, 'Come to the Grand Central Station;' they said, 'Tell Moon to come.' They did not know it was me. I recognized the voice of Mrs. Rand, and they were just walking out of the Grand Central Station on Main street, and I drove up to the corner, and Mrs. Rand and my wife came up and got in the car. Mrs. Rand getting in the back, and my wife with me, and I noticed my wife looking bad, and I asked her several times how she felt going home, and did she enjoy her trip; and after we arrived home she put her pocketbook in the right-hand drawer of the dresser. The dresser was facing me like that stand, and she put her pocketbook and several little articles she had in her hand in it and went into the bathroom just after she come home. As I opened the drawer, I noticed her handkerchief, and I always put the money I take in in the drawer, and I pulled the handkerchief out, and this needle was wrapped up in the handkerchief, and it fell out in the drawer just as Mrs. J. M. Rand walked from her room into our room, and I recognized it as being a syringe, and I asked her sister, 'What do you think of this?' standing there with it in my hand, and she said, 'I don't know.' At that time my wife came out of the bathroom, and saw me with the needle in my hand, and she

run up and grabbed it, and she said, 'What are you doing with that?' and I said, 'Are you doing that, Honey,' and she said, 'No; it belongs to some one else,' and I noticed the color of her face, and she wrapped it up and put it in her apron pocket.

"After that I saw her using the syringe. She had become very sick at times, at her stomach, and she would have to leave the table and did not have any appetite, and would leave the table and go to the bathroom, and at night, when I would go to bed, she would get up at maybe three o'clock in the morning and slip in the bathroom, thinking I was asleep, and several times I have walked to the bathroom and watched her take a shot of morphine, and several times walked up and tried to get her not to take it. I had tried to persuade her to quit the habit.

"On several occasions I had caught letters from a dentist, Dr. Wilsmore, West Frankfort, Ill., who was on morphine, and had been here prior to her trip to St. Louis, and one night she asked me about having a card party at my house for a friend of a girl next door, and I suggested that it would be all right with me. I had to work, and on returning home that night about 11:30 I was introduced to this Dr. Wilsmore, and I did not ask any question. There was quite a bunch playing cards, Mrs. Rand, my wife and the lady next door, I can't think of her name; her husband is a Jew. She was over there, and this doctor was supposed to be her friend. I understood it from my wife that way. The card game broke up after I got home a few minutes, and my wife suggested that we take Dr. Wilsmore to the Chisca Hotel. Mrs. Rand, the lady next door, who this doctor was supposed to be her friend, my wife, and myself got in my automobile, which was in front of

the house, and started. I lived on the corner of Walnut and St. Paul, and we turned out Walnut into Vance and went out Vance to East and pulled up on the corner of East and Union at the hamburger stand, and there were three or four in the party had a hamburger, and I think I had one and drank a bottle of Nib, and we rode out Union as far as, or several blocks, and turned around, and my wife informed me to drive to the Chisca Hotel and leave Dr. Wilsmore, which I did; and I did not see Dr. Wilsmore but that one time; I never had seen him before or after that. I caught some letters from him to her from West Frankfort, Ill., after her trip to St. Louis, stating my wife had had a wreck in West Frankfort, and I had understood she had been to St. Louis, and she had also been to West Frankfort, and one was quite a love letter. I received two at one time, and I got them at the door. She was asleep as I went to work. I always went to work at 2:30, and I happened to find these letters. The postman left them downstairs at the front door, and at that time she had gotten up out of bed and was standing at the top of the stairs, and saw me pick these letters up, and she walked down to me, and saw that they were for her, and I walked outside, and she followed me, and I stepped in the door and pulled it to with her on the outside. with her looking through the glass door, and I tore the letters open and read them and unlocked the door and walked upstairs; and after I got upstairs and was sitting on the bed I gave her the two letters which she gave back to me, and that night she gained possession of the letters again. Our separation came about as the result of other men."

The only evidence corroborating the defendant as to his wife's taking morphine is that when she was found

dead in the back end of the car she was lying upon her pocketbook, and in this pocketbook there was found a hypodermic syringe and needle.

It is the theory of the State that this syringe and needle were placed in the pocketbook by the defendant. He testified that his wife was seated in front when she committed suicide; that he took her body and placed it in the back end of the car; and he does not undertake to testify as to how her pocketbook happened to be beneath her in the back end of the car.

Mrs. Rand testified that she never saw or heard of the deceased using morphine, and had never seen a hypodermic syringe and needle in her possession.

Dr. Drake was called to the Harahan Bridge upon the discovery of the body of the deceased, and found the syringe and needle in the pocketbook as detailed above. His evidence on this matter is as follows:

"Q. When you were at the automobile on the bridge, did you see a woman's purse?

"A. I did.

"Q. Please tell the jury what were the contents of that purse.

"A. A handkerchief, and I think there was a dollar bill and some silver change, making up probably 60-odd cents, a hypodermic syringe with a needle in it, and two checks to a baseball game.

"Q. Was that about all that you can remember?

"A. Yes, sir.

"Q. Was this hypodermic syringe, as you call it, with a needle, such an instrument as is commonly used by morphine addicts and doctors for the purpose of administering morphine in the arm?

Moon v. State.

"A. Yes, sir.

"Q. Doctor, I will ask you to examine that syringe; is there anything in it now?

"A. No, sir.

"Q. Was there anything in it at the time you got it?

"A. No, sir.

"Q. Doctor, I will ask you whether or not in your examination of the body of the deceased you found any marks of hypodermic syringe on the body.

"A. I did not.

"Q. Doctor, did you look for them?

"A. I did.

"Q. You would not naturally expect to find anything in the hypodermic needle until it was being used, would you?

"A. I could not answer that question.

"Q. They do not usually carry it loaded?

"A. Sometimes they do."

We are of the opinion that the evidence preponderates against the contention of the defendant that his wife was a morphine addict. We are further of the opinion that the evidence does not support the claim of the defendant that his wife was unduly intimate with Dr. Wilsmore. His story about the letters is an unreasonable and improbable one, and his statement is inconsistent in that he says his wife was asleep when he left the house, and again he says that she got to the door when he did and followed him out in front, when he stepped back and locked her out. The defendant does not produce a single witness who testified that there was such a person as Dr. Wilsmore, or that he visited Memphis, or that he was connected with the deceased or wrote her any letters.

146 Tenn.—22

The defendant's version as to what occurred upon leaving the home of Mrs. Rand on the afternoon of the shooting is as follows:

"On the day of the 24th my wife called me up about 9 o'clock that morning—on the previous day I had been with her that night, the previous night—and asked me if I was not coming out to take her to Raleigh for a swim, and her little niece, and I told her I thought I would if I did not have anything else to do. She called me up that morning at 9 o'clock and wanted to know if I was coming out, and I told her I thought I would. She talked a little while, just a little conversation, and at 11:25 she called me again and told me to come out. 'All right,' I said I would, and I got in my car and went out there, and I got out there about a quarter to 12. She was laying on the bed. I walked up, and she met me at the door and kissed me, and I come in, and she asked me how I felt, and I told her I was not feeling very well, and she said, 'Lay down across the bed and get under the fan,' which I did, and she got up and turned on the fan; and I was laying there talking about one thing and another, I don't remember just what, and I asked her, 'Didn't you say you wanted to go to Raleigh,' and she said, 'Yes; but I don't feel very much like going to Raleigh.' She said, 'You lay down and rest a while; you look like you feel bad,' which I did, and she laid diagonally across the bed and put her feet across my feet, and we talked there a while, and I finally got up, and she said, 'Are you ready to go?' and I said, 'I am,' and she said, 'Wait, let me comb my hair and put on a dress'— she was in her nightgown—which she did and combed her hair and put on her shoes, and she asked me did I care if Sweet went—that was her sister, Mrs. Rand—and I said

'No,' and she asked her sister did she want to go. When
we started out the hall, I presume I had been there an hour,
maybe a little longer, probably an hour and a half, and
that would make it 1:45 or a quarter to 2; and we started
out to take a ride, get some air.  Her sister walked out
the room into the hall, and my wife asked her again didn't
she want to catch a little air, and she said 'No; I don't
feel very well; I don't believe I do,' and she said, 'All
right; we will be back pretty soon,' and we went down
and got in the automobile, and I was driving, and I was on
the corner of St. Paul and Walnut, on St. Paul, and I
drove around the corner and down Walnut to Vance and
down Vance to East and East to Union and out Union to
the barbecue stand, right at the car line on North Speed-
way, right across from Overton Park, and I was very fond
of the Mexican style chicken sandwiches they had there,
and I ordered one, and I asked her if she wanted a chicken
sandwich, and she said that she would take a piece of
watermelon, and I said I would take a sandwich and drive
up and get a piece of watermelon, and I got my sandwich
and opened it up and went up to the watermelon stand
and got the watermelon, and then she asked me where I
was going, and I said it did not make any difference.  And
there were two ladies in a Ford sedan in front, and they
kept watching us, and she kept asking, 'Do they know
you?' and I said 'No,' and she said, 'Let me drive,' and
she got under the wheel, and drove out Summer avenue,
I presume, about six miles, or four or five miles, and I
asked her, 'Where are you going?' and we were driving
along Summer avenue, and she said, 'Not any place par-
ticularly,' and I said, 'It is about time I was going back
to work, about 3 o'clock, and I always meet my trains,'

and she said, 'What do you want to do?' and I said, 'I want to go back and go to work.' 'All right.' She turned at once, to the left in a little roadway, and then she said, 'You had better take it,' and she moved over, and I taken the wheel, and backed up and headed my car for Memphis and started in to town, and we had not gotten very far, about a mile, maybe not quite that far, and I stopped my car to get out to urinate, and I got out and walked to the back. And as I approached the car she had been searching for letters or something she said I was getting, and she was trying to find some letters some one had written me, and she was searching the car when I left to walk back, and when I come back, as I went to step up, just as I started to step, she had gotten the pistol out of the right-hand front pocket where I had it, and had it in both hands, her left hand and her right hand, and she fired at me twice. I turned to run, the car being on the left-hand side of the street, right at the edge of the street so as to give people room to pass if they wanted to, should anybody happen to pass; and at that I wheeled to run and fell in a ditch which was a kind of gulley about a foot deep, slanting, and as I fell I was so excited, before I got up, why, I heard two shots I thought to be. I was not sure, but now it must have been three, and I did not know but what she was shooting at me, and I jumped up and run to the back of the car; and after the shooting stopped I run back and saw she had shot herself, and I could see she was almost dead, and I reached up and grabbed her and put my arm around her, and kissed her; and I saw she was dying and breathing her last, and I picked her up and laid her in the back of the car. I stepped up on the running board and picked her up in my arms and laid her in the back of the car on some newspapers

which were back there. Seeing she was dead, I picked the pistol up and tried to kill myself and snapped it several times, and, finding the pistol would not shoot, I threw the pistol down, up against the running board of the car, got in my car, and decided to make it to the Harahan bridge and commit suicide, which I did. I arrived at the Harahan bridge and stopped there and got out and walked to the side of the bridge, climbed up on it, and looked back and saw an automobile with a boy in it whom I recognized as a chauffeur, and hollered and told him to call an ambulance, my wife was dead in the back of the car, and call an ambulance quick, and jumped overboard over the bridge.

"While we were riding around town we had discussed letters which she had received from other men. I told her I thought it best that I should not live with her; I did not think she loved me in the right way or she would not do me as she did. I explained to her that I did not intend to live with her any more."

He was shown the pistol and said it was the one she fired the shots with. Said it belonged to Mr. Williams, and that he got it on the morning of the 24th; that he had spent the Sunday previous with his brother, and he had invited defendant down to Lakeview to see some launches he had there.

"He asked me if I could not come down, and I told him I would later on in the week, and I borrowed that gun to take with me down there to shoot something. On previous times my wife had told me she wanted me to get a pistol. We had been riding out on the Hernando road by the cemetery several times, and she had become frightened a couple of times, and asked me to get a pistol. I got that pistol

with the intention of going with my brother to Lakeview to shoot at something."

On cross-examination he testified as follows:

"I did not see her until I had my hand on the back door, and I started to step up on the running board, and just as I did she fired at me. She did not hit me. I was not more than four or five feet from her.

"She never said anything—just fired. She was holding the pistol in both hands. I was on the left side of her and back of her. The wheel was between where my wife was and the left-hand front door. She was sitting about the middle of the seat. She did not turn and have her hands resting on the back of the front seat of the car. They were not resting anywhere. She was seated looking this way, the way we were headed. She swung around in such way that the first time she fired I fell. She fired quick, one right after the other. I turned to run and stumbled over my own foot and fell in the gulley. I thought there were two more shots, but I suppose, from what Dr. Drake said, there were three.

"She was dead when I came from behind the car. She never said a word from the time I got out of the car until I came from behind it, and found her dead or dying. She did not say to me at the time that she was going to kill me and herself. She made no threat, said nothing, after I got out of the car. She did not speak."

Said he did not know how many newspapers were in the back of the car or whether they were old papers or not.

Was asked what made him put his wife in the back of the car, and said:

"When I came back and got in my car, I threw my arm around her, seeing she was dying, and I intended to put

her in the back of the car, intending to make a run for the hospital. I put my arm around her and kissed her, and put her on the back seat."

Was asked .why he did not hold her on the front seat, and said:

"I was intending driving, and she was laying on the front seat. I did not have my mind made up. The first thought that hit me was the hospital, and I thought she was dying or dead, and I decided to end it all. I did not want to take her home or anywhere else. I thought I would drive to the river and jump off. I knew she was dead. At that time I had no idea how to get to the bridge."

Said he could have come by a hospital in going to the bridge.

He further testified as follows:

"Q. And you were on perfectly good terms with your wife and Mrs. Rand when you left the house with her?

"A. Well, I was in a way.

"Q. What do you mean by that?

"A. Well, I left her, and thought as much of her as I ever had, and I talked to her, and thought my leaving her would make her be better, make her think I was never going to be back, and get her off the morphine and make her change her way of living.

"Q. While you were trying to cure her by the absent treatment, you were out with Mrs. Odle every night?

"A. Not every night; no, sir.

"Q. The three nights that you knew her you were out with her?

"A. I was."

He further testified that at the time he got out of the car and walked to the back she had not opened her mouth. He was then asked this question:

"Q. There was nothing there to enrage her at that time?

"A. Not that I know of."

Much time and space were consumed by counsel in theorizing as to the point where the shooting was done.

After carefully reading the evidence, we cannot see that this is a material question, and whether the shooting occurred in the subway or on Summer avenue would not shed any light on whether the deceased shot herself or was killed by the defendant.

As to the location and nature of the wounds on the body of the deceased Dr. Drake testified as follows:

"Q. Just state to the jury now what wounds, if any, you found on this body.

"A Pistol shot wounds entering her left side and coming out or not coming out on the right-hand side.

"Q. Pistol shots entering on the left side and coming out or not coming out on the right-hand side?

"A. I mean some came out and some did not.

"Q. How many pistol shot wounds did you see on the left side of the body?

"A. Three.

"Q. You state they entered from the left side?

"A. Yes, sir.

"Q. Could you state now to the jury, Doctor, or just describe to the jury, the position on the left side of those wounds in that body?

"A. State the question again.

"Q. Could you state more exactly or locate those wounds that you found on the left side of the body?

"A. Right in here, in the region of the heart, two of them were.

"Q. Within what distance were they, would you say, Doctor?

"A. Within an inch or so.

"Q. There was two of them?

"A. Yes, sir.

"Q. Where was the other one?

"A. The other was in the gland of the breast.

"Q. The two that you say entered within a radius of one inch, did they penetrate the body?

"A. Yes, sir.

"Q. Could you state whether or not they came out or did you see any place that they came out?  A. Yes, sir.

"Q. Where was that, Doctor?

"A. They came out on the right; they went practically straight through the body.

"Q. Doctor, I will ask you whether or not you found any bullets or balls lodged in the body?

"A. Yes, sir.

"Q. Where was that?

"A. It was about the lower end of the ribs on the right side.

"Q. Did you remove that ball?

"A. The undertaker did for me.

"Q. You were present?

"A. Yes, sir.

"Q. What was done; was it turned over to you?

"A. It was turned over to me and I turned it over to the detective department.

"Q. I will ask you whether or not the two wounds that you have described as penetrating the body, you state they entered from the left-hand side and came out on the right?

"A. Yes, sir.

"Q. Were there any powder burns there, Doctor?

"A. Yes, sir.

"Q. On what side of the body?

"A. On the left side.

"Q. Around or near the wounds?

"A. Yes, sir.

"Q. I will ask you whether or not these wounds that penetrated the body penetrated the heart?

"A. Yes, sir.

"Q. One or two?

"A. Both of them.

"Q. I will ask you whether or not either of those wounds would have been fatal?

"A. Yes, sir.

"Q. I will ask you whether or not they caused the death of this person whose body you examined.

"A. Yes, sir.

"Q. You stated that either one of them would have been fatal without the infliction of the other?

"A. Yes, sir.

"Q. Would either one of those wounds have been sufficient to cause instant death?

"The Court: You mean either of the two?

"Q. Either of the two that penetrated the heart. Doctor, just using me as an example, just point out on my body and locate it so that the jury can get it clear, and also for the purpose of the record, just exactly the location of those wounds.

"A. On the left side.

"Mr. Bell: You have got your finger immediately under the nipple.

"A. Yes, sir, about here to the best of my recollection, where the pencil is, is the entrance.

"The Court: Describe that so the stenographer can get it in the record.

"A. The other one was an inch or maybe a little below that, and one right through the breast, what we call a flesh wound. They all came out over here with the exception of one.

"Q. Just show the jury the exit of those wounds, the place where the bullet was taken out.

"A. At about the last rib.

"Q. Was that the position where the ball was taken out?

"A. Yes, sir; underneath the skin, the last rib you see, about the last rib, and the other one directly underneath this arm or right here.

"Q. Doctor, just for the purpose of the record and to clarify it in the minds of the jury, just locate the exact position of the human heart as near as you can.

"A. It is in the left chest, probably 3 to 5 inches long, 2½ to 3½ inches thick, and 2½ to 3 inches broad.

"Q. Is it near the center of the left chest?

"A. You mean this is the center going this way?

"Q. No; counting a line going straight down the center of the body.

"A. It is nearer the left side than the center of the body.

"Q. Then, taking it from the center line of the body, which I shall call it, where the ribs join up in the middle, and back to a straight line along the left-hand side at a point even with the heart, could a person penetrate the heart along that line in front here; I say right straight across the chest could a person self-inflict a wound going from along the front there, from that point along the front there?

"A. No, sir."

One bullet of the same caliber as that taken from the body of the deceased was extracted from the cushion and was made an exhibit to the transcript. The evidence indicates that this ball was taken from a point just back of the steering wheel and between the center and top of the cushion.

It should be stated that practically every act or statement testified to by witnesses derogatory to the defendant was denied by him.

Relative to the purpose for which the defendant procured the pistol from Mrs. Williams, with which deceased was killed, the defendant further testified that he did not go to his brother's because his wife insisted on his staying there; said "she asked me to lay down and talk." Said he did not notify his brother that he was not coming or that he did not intend to meet him on McLemore street. Said he had made arrangements to meet his brother on Sunday before this. Said his brother had a telephone and there was a telephone in his wife's apartment, but did not notify him that he was not coming.

Said they were going to Lakeview; that his brother had some gasoline boats down there and was going to sell one for $90; that his brother was to take him to Lakeview fishing and to look at these boats, but did not know who he was going to sell the boat to; that his brother had a car and he had a car.

The State introduced Lee Hearen, and he testified that he lived at Direct, Tex., which is in the northeast portion of the State, in Lamar county; lived with his father and mother. Said he remembered the day he was on the bridge when he saw a woman that was shot there. He said he

came into Memphis that morning; just had come through Memphis about four months before that, but did not stay any length of time; that on the day he saw the woman on the bridge that had been shot it was something near 3 o'clock in the afternoon; it was the 24th day of August. Said:

"I was with a young boy; Fred Young he told me his name was. We had entered the bridge from the Tennessee side. We had gotten up on the bridge about fifty yards when an automobile passed us and stopped a short distance further on on the bridge."

Said: "I never saw but one person in it. It was a man I saw in the car. It passed me something like one hundred and fifty yards before it stopped; did not hear any shots fired as it was on the bridge and approaching the bridge."

Said what attracted his attention to this automobile after it passed was a man came from behind the car and halloed. Said he had gotten out of the car and was coming from behind the car when he halloed. He first halloed and then motioned to me. He looked in my direction and then motioned. He motioned me to come towards him.

He went towards defendant. Said he did not get to him, but that he got near to him.

Said, when he got about twenty or thirty feet of him, defendant climbed upon the railing of the bridge and jumped over it into the river; that he did not go back to the car at any time after he got out and motioned to him; he never got in the car at any time. Said he heard him say a few things before he went over the bridge. He said, "I have killed my wife; she is on the back seat; call the undertaker; I will end it all; good-bye; I am gone," and then he jumped over. Said he went to the automobile after that.

Said: "I saw a woman in the automobile lying between the two seats on the floor. She was not living; she was dead. Her dress was bloody. The dress she had on looked like this one. I have been in jail with the defendant, Moon, since the day of my arrest. I see him in the courtroom now. I do not know whether he is the man I saw jump over the railing or not. I was there on the bridge on my way back to Texas on that day. I was traveling as a free agent. I was not traveling on a ticket. I was taken into custody at the time as a State's witness and brought to the police station and have been detained in jail ever since."

"The young man, Fred Young, who was with me said he was nineteen years old. He was traveling in the same manner I was. He told me he lived in Little Rock. He was detained as a State's witness, and I heard him make a statement relative to the affair. He was with me at the time. I saw him in the courthouse to-day. I do not know where he is now. I do not know what happened to him, or if he is here or not; I do not know whether he left hurriedly or otherwise."

He was then asked, "Where is the last place you saw him?" to which the witness replied:

"He stepped out of the door of the sheriff's office to get a drink of water, and did not come back."

On cross-examination he said: "I am nineteen years old, and was not doing anything in Memphis. The reason I left Texas was I went to Alabama to hunt better work. I went there riding a train. I did not hobo my way to Alabama. I had a ticket to Carbon Hill, Ala., from Memphis; that he came from 'Carbon Hill to Memphis on a freight train and without a ticket."

Said: "When I was carried to jail, I made a statement in writing to Lieut. Barnard that was signed by me and Fred Young."

Said: "I listened to the statement, and afterwards saw the statement. It was published in the Commercial Appeal. I read it and saw it. It was published correctly, I think."

This boy had no interest whatever in this case, and he and his companion, Young, were unquestionably on the bridge when the defendant drove up, because the officers arrested them and confined them in jail until the day of the trial as witnesses for the State, on which day it appears that Young made his escape.

The statement, which was written down by a stenographer and signed by this witness and Young, was introduced in evidence, and it appears therefrom that defendant and his wife were seated on the front seat of the car when they passed these boys.

The witness Hearen testified that this was a mistake and was not true, and that he only saw the defendant as the car passed. There was nothing especially to attract his attention as the car passed, and assuming that, upon being interrogated about the matter at the time, he had an impression that they were both sitting on the front seat as the car passed, would not necessarily impeach his testimony as to what the defendant said and did. This other was an immaterial matter, about which he could have been mistaken, or it may have been the statement of Young, and the stenographer may have made a mistake in setting it out as the testimony of both.

This is a fact about which there was no controversy, and there was no occasion for the witness to falsify about

it, and, if he contradicted himself, it was on an immaterial matter.

The State also introduced F. B. Erwin, who testified that he was in the public hauling business and knew the defendant and had known him two or three years, and saw him on August 24th on the Harahan bridge. He was on the north side going towards Arkansas; that is, the side that traffic takes to go into Arkansas.

"I was on the same side of the bridge. I was going to Arkansas and was behind the defendant. The first thing that attracted my attention was the automobile standing on the bridge, and at the time I noticed that I noticed a man sitting on the rail of the bridge. The man on the rail I recognized when I got in about thirty feet of him. He just remarked and called me by name and said, 'Erwin, you will find my wife dead in the back of the car; call John J. Collins,' and then jumped into the river. If I am not mistaken, he said, 'Tell everybody good-bye; I am gone.' "

"He did not say anything else that I can recall. That was at the point where he was over the river itself. He had not reached the Arkansas bank; that was in Shelby county."

Said: "I got out of my car there. There were two other men in the car with me, and we walked up to the car to see who this party was in the car. We found her there. She was lying in the back of the car. I did not see any weapon in the hand of the defendant when he appeared on the railing. I did not find any weapon in the car or around it. I stayed there until Capt. Kehoe got there. I did not find any pistol at all, either before or after Capt. Kehoe got there."

It is insisted that the testimony of Erwin contradicts that of Hearen in that the former stated that deceased said, "You will find my wife dead in the back of the car," while Hearen testified that defendant stated to him, "I have killed my wife; she is on the back seat."

It is not at all clear that the statements testified to by said two witnesses were one and the same, but the record rather indicates that defendant made the statement to Hearen first and later saw Erwin, with whom he was acquainted, and made the statement to him referred to above.

The State also introduced E. R. Barnard, a lieutenant connected with the detective department of the city of Memphis, who testified that he talked to the defendant on the afternoon of the killing at the police headquarters; that the defendant stated to him that "he went by the house and got his wife, and had intended to go to Raleigh and changed his mind, and rode around town a while and started across the river."

The defendant was interrogated about his statements to Lieut. Barnard as follows:

"Q. Didn't you tell him she shot herself on the Harahan bridge?

"A. I did not tell him she shot herself on the bridge.

"Q. What did you tell him?

"A. I told him it happened on the Harahan bridge.

"Q. What were [you] talking about then?

"A. The murder or suicide.

"Q. The murder or suicide?

"A. Yes, sir.

"Q. And you meant to convey the information to him that she had either been murdered or committed suicide on the Harahan bridge?

146 Tenn.—23

"A. I didn't mean only what I said; I said I did not have any objection making the statement at all.

"Q. Well, you were talking about the death of your wife?

"A. Yes, sir; I was.

"Q. And that was what he was talking about?

"A. Yes, sir.

"Q. And you told him it happened on the Harahan bridge?

"A. Yes, sir; I did.

"Q. But it did not?

"A. Not the suicide, no sir.

"Q. You never told Barnard at that time that it happened out on Summer avenue?

"A. No, sir."

The foregoing is a full statement of the material evidence introduced on the trial of the case.

The defendant stands contradicted by a number of disinterested witnesses on material matters. He contradicted himself in several instances, and admitted that he made false statements to Lieut. Barnard about where the suicide or murder occurred. Furthermore, he is contradicted by the physical facts and circumstances in the case. His defense finds support alone in his own testimony. He is not corroborated as to a single material fact as testified to by him. His theory as to the shooting is very unreasonable. He admitted that he had quit his wife. His reasons assigned therefor find no support from anything appearing in the record. There is nothing to prove that the deceased had been untrue to the defendant. His claim that she was a morphine addict is not sustained by the evidence. The first time he claimed to have knowledge that she was using

morphine was when she returned from Marion, Ill., eight days before her death. Conceding this to be true, no man that cares for his wife would, under such circumstances, abruptly withdraw from her, instead of aiding and assisting her in overcoming the habit, and take up with a woman of bad repute.

The letter written to the defendant by the deceased, in conjunction with his admitted association with Mrs. Odle, indicated that he was tired of his wife and infatuated with some other woman.

The method by which he procured the pistol is a most potent circumstance against him. He importuned his business associate, Williams, to lend him his pistol, which he declined to do. He then went to Mrs. Williams and procured it by making a false statement. It is unreasonable to suppose that he would have done this had he merely wanted it for the purpose testified to by him. It does not appear that he had any definite purpose in procuring it according to his testimony. As to his purpose he is contradicted by his brother. The defendant testified that the purpose of the trip was to fish and hunt and to inspect some gasoline launches and boats his brother was trying to sell; whereas his brother testified that the trip was to be made for the purpose of carrying a younger brother riding in the boats, and that they were not going to hunt and fish. Although both claimed that they had an engagement with each other at the home of C. G. Moon that afternoon, neither attempted to make explanation as to why they had not communicated with each other, when the defendant was at the home of his wife, who had a telephone, and C. G. Moon was at his home and had a telephone. The

defendant testified that he knew that he could not fill his engagement with his brother. ,

We have the further statements of Mrs. Odle, Mr. Bowers, and Mr. Shaughn as to statements made by deceased showing an intention to get rid of his wife. These parties were all friendly to the defendant and had no interest in the case.

There is the testimony of Mrs. Rand (who is interested) that the defendant was making particular inquiry as to the location of the heart, and that he failed to ask her to drive with them that afternoon, which he had always done theretofore.

It is stated that it is unreasonable to believe that the defendant would have made all these damaging statements if he were planning to kill his wife, but that was characteristic of his entire conduct in the matter. It often happens that, where a party becomes so depraved as to deliberately plan a crime of this nature, he acts foolishly and apparently without reason.

One of the most potent circumstances pointing to the guilt of the defendant is the unreasonableness of his contention that his wife, who was right-handed, shot herself three times in the manner disclosed by the record and fired one ball into the back cushion of the front seat. As we understand the record, it is not claimed that the ball in the back of the front seat passed through her body.

The defendant's statement that his wife, when apparently in a good humor and without saying a word, began firing at him and then killed herself, is unbelievable. In addition to this we have the uncontroverted statement of Dr. Drake that, having once shot herself through the heart, she could not fire the pistol again. This question will be referred to more in detail later. .

Upon the whole, the evidence abundantly sustains the verdict of the jury, and it results that the first three assignments of error will be overruled.

The fourth and fifth assignments of error are closely related and were treated together in the brief of counsel for the defendant, and they are as follows:

"Fourth. The court erred in the following particulars:

"When Dr. Drake was a witness, testifying in this case on his direct examination, the following proceedings were had, to-wit:

" 'Q. I will ask you what position or what radius or scope these three bullets would have been in if they had been inflicted upon that body by the person; that is, whether or not they would have been in the position that you saw them, further in view of the fact that the person upon whose body they were inflicted was a right-handed person?

" 'A. They could not have been inflicted.

" 'Q. They could not have been inflicted in that position, you state?

" 'A. Yes, sir.

" 'Mr. Bell: I move to exclude that answer, because this question does not call for particular expert testimony, and it is a question to be decided by the jury as to whether or not a person could have fired those shots, and it is for the jury, and does not take a doctor, and they can decide it as good as he can.

" 'The Court: The doctor can state an opinion.

" 'Mr. Bell: He cannot state an opinion on that and that is my objection.

" 'The Court: Objection overruled.

" 'Mr. Bell: And the defendant excepts.'

'This was error, because it was not a matter requiring the special knowledge of a surgeon, and any intelligent layman was as competent to decide the question as the witness.

"Fifth. Because the court erred in the following particulars, to-wit:

"When Dr. Drake was on the stand as a witness, and when being examined by the State's attorney on direct examination, the following proceedings were had:

" 'Q. I will ask you, Doctor, whether or not after the infliction of one of these wounds, say the one that went directly through the body, you stated it came out a little high on the right-hand side, after the infliction of that wound entering the heart, it would have been possible for the person who received that wound to have done any further act with their hands or done anything further?

" 'Mr. Bell: That is a question for the jury to decide; it is not a question for the doctor.

" 'The Court: This witness has qualified as an expert and a physician, and he can give his opinion.

" 'Mr. Bell: He can give an opinion, but this witness cannot say whether it is possible or not, only in his opinion that he did not think it did.

" 'The Court: Yes; the objection is sustained.

" 'Q. Doctor, what, in your opinion, based upon your opinion, does it—or I will ask another question to the doctor. I will ask you whether or not you have had much or little experience in the examination of bodies that have been wounded and suffered pistol shot wounds in your capacity and position with the police department?

" 'A. It has been considerable.

Moon v. State.

" 'Q. And that has been constant since 1913 or 1912, since you have been connected with the police department?

" 'A. Yes, sir.

" 'Q. I will ask you whether or not, in your opinion, based upon your medical experience and practice and study, that a person that has received any wound going directly through the body and penetrating their heart, if, in your opinion, it would have been possible for that person to perform any deliberate act with their hands or any other part of the body?

" 'A. It would not.

" 'Mr. Bell: Defendant excepts.'

"This was error, because as a matter of law and a scientific fact of which the court takes judicial knowledge, that it is not a physical impossibility for a person who has been wounded in the heart to live some time afterwards, and to fire shots from a revolver after receiving the wound through the heart which resulted in his death, and because it was an invasion of the province of the jury."

The general rule as to admission of opinion evidence is thus stated in 16 Corpus Juris, 747, to-wit:

"While the rules governing the admissibility of opinion and expert testimony are the same in criminal as in civil cases, the desirability of keeping 'expert testimony within proper bounds is especially manifest in criminal cases where the life or liberty of accused is at stake. It is a general rule that a witness must state facts, and not his opinions or conclusions. But there are exceptions to the rule as well settled as the rule itself. An ordinary witness may be permitted to testify to his opinion or conclusion where the facts as they appeared to him at the time cannot clearly and adequately be reproduced, de-

scribed, and detailed to the jury; and an expert witness—that is, one who is skilled in some art, trade, or science, or who has knowledge and experience in relation to matters which are not within the knowledge of men of common education and experience generally—may express an opinion on a state of facts which is within his specialty and which is involved in the inquiry. However, where the facts are such that they can be placed before and understood by the jury, and where there are such matters of common observation and experience that the jurors are just as competent to draw inferences therefrom as the witness, there is no necessity for receiving the opinion of either an ordinary or a skilled witness, and such opinion is not admissible. The test is: Can all the data be exactly reproduced, and is the jury equipped to draw inferences therefrom?"

The case of *McCravy et al.* v. *State*, 133 Tenn., 358, 181 S. W., 165, is relied upon by the defendant as sustaining his contention. We quote from the opinion in that case as follows:

"On Thanksgiving Day, November 26, 1914, Mrs. McCravy, wife of defendant George McCravy, was shot in the arm and head. The doctor who attended her stated that the ball entered the left side of the head above the left ear and to the front near the temple, ranging about half an inch downward, coming out on the other side of the head. The next day he discovered a bullet wound also in her left arm above the elbow, and he stated that this wound indicated that the ball had entered from the outside of the arm, coming out on the inside next to the body. The theory of the State was that both these wounds were from one pistol shot, and that her left arm was evidently thrown

up to guard against the assault when both wounds were received.   .   .   .

"The most difficult fact to get over by the defendant is the testimony of the doctor as to the range of the bullet, the position of the wounds, and his statement that these wounds could not have been inflicted by Mrs. McCravy. However, we are not convinced that it was impossible for Mrs. McCravy to have fired the shot or shots. There could have been more than one shot fired. There is a possibility that the doctor was mistaken as to the range of the ball, although he was probably correct in his conclusion. He gave no reason, however, showing why he knew the ball ranged from the left to the right side. He is evidently an honest, straightforward, and competent man; but we are not convinced from his testimony that he was correct in his conclusion that this ball could not have been fired by Mrs. McCravy, passing through the left arm and through the head as he indicated. He is not shown to be an expert on the use of firearms.

"Mrs. McCravy was probably a slender woman. While a stocky built, fleshy person could not without difficulty reach around and fire a shot into the left side of the head, it is very apparent to us that a slender person could do so, and we see no reason why such person could not also fire through the left arm at the same time. Mrs. McCravy may have used her left arm to shield her face from the fire of the pistol. She could have pulled the trigger with her thumb, holding the stock of the pistol in the same hand, with the weapon pointed toward her head and against the outside of her arm thrown up against the side of her head.   .   .   .

"There is one assignment of error in regard to admission
of testimony which we do deem of sufficient importance to
rule upon, and that is as to the alleged error of the court
in allowing Dr. Myers to testify, over the objection of de-
fendants, in substance, that it would not have been possible
for the injured woman, Mrs. McCravy, to have shot herself
in the manner in which she was shot. We think that his
testimony was competent giving his opinion as to the range
of the bullet. He did not say that he was a man of ex-
perience in the treatment of gunshot wounds, but no ex-
ception was taken to his testimony on the ground that he
had not qualified as an expert, and we think an expert
may properly testify as to the range of a bullet through
any part of the human body. That involves a question of
anatomy and is sufficiently scientific in its nature as to ad-
mit of expert testimony. We are of opinion, however, that
it was error to permit him to give his opinion as an expert,
or to state as he did, in substance, positively that the
bullet could not have been shot by Mrs. McCravy in the
manner in which she was shot. Testimony is permissible
allowing an expert to state a conclusion or give an opinion
on a subject which is peculiarly a matter of superior knowl-
edge on his part, for the reason that the lay mind is not
so competent to form an opinion or reach a conclusion.
Such expert opinion or conclusion, however, may be per-
mitted only in matters peculiarly within the knowledge of
an expert. The question whether a delicate woman can
reach around with the right hand and shoot herself in the
left side of the head, or whether she can do so at the same
time shooting herself through the left arm, is not pecu-
liarly a matter of expert learning upon the part of a physi-
cian. This is a conclusion which the ordinary practical

mind may reach, as well as the trained physician, and can be more readily reached by one trained in the use of firearms. Whether Mrs. McCravy shot herself was the ultimate fact to be reached by the jury, because if she shot herself it necessarily follows that both defendants were innocent. To permit the doctor to say whether it was possible for her to do this, when the jury could as well reach the same conclusion, was an invasion of their province. *Telephone & Telegraph Co.* v. *Mill Co.,* 129 Tenn., 374, 381, 382, 160 S. W., 1145.

"It is not a question of anatomy, but a question of the physical use of the hand and arm with a Colt's .25 automatic revolver, as to whether this wound could have been self-inflicted. The doctor introduced by the State may have known very little about the use of such firearms. A slender, wiry person, such as this woman doubtless was, who knew how to use a weapon like this as she did, may have been able to inflict the wound as described by the doctor."

In *State* v. *Perry,* 41 W. Va., 650, 24 S. E., 634, it appeared that an unmarried female had called upon a physician, who had administered to her ether and chloroform, and who claimed as she was coming from under the influence of the chloroform that she discovered the doctor was in the act of assaulting her; that he had pulled her down in the chair; that he had elevated her clothes; that he had parted her lower limbs or legs; and that he was down upon his knees and had partially succeeded in penetrating her person. The proof further discloses that the physician weighed two hundred and thirty pounds and had a wooden leg. A hypothetical question was put to another surgeon as to whether or not it was possible for the

physician to assume this posture with a wooden leg and to perform the act of sexual intercourse described by the lady. This was objected to. The court first said that the physician could have exhibited the wooden leg to the jury as evidence of his inability to do this, but that, even in such case, it was proper to supplement this testimony with the testimony of witnesses who had made the human system, including its joints and organs, a subject of peculiar study, such as the jury would be unable to give in the short time allowed them in the examination of the evidence, and thus assist them in arriving at a just conclusion. This case bases the competency of this opinion evidence upon the fact that the subject being dealt with was the human body and the capacity to use the limbs and the other organs of the body in the way described by the witness, and that such knowledge was peculiarly one within the knowledge of the medical profession, and not within the knowledge of the jury. The opinion was also upon the very question which the jury had to decide.

In *State* v. *Lee,* 65 Conn., 280, 30 Atl., 1110, 27 L. R. A., 498, 48 Am. St. Rep., 202, it appeared that a physician had been indicted for the creation of an abortion, and the victim of the alleged crime was a woman, whose death was caused by a lacerated wound of the uterus made by some instrument used in the production of abortion shortly prior to her death, and the defendant was a practicing physician. She had made a dying declaration in which she accused this physician of probing the uterus and the womb with a metal instrument. The physician testified that he had treated her in her last illness, and that after the dying declaration was alleged to have been made she admitted to him that she had performed the operation

herself and made the probe with the instrument. Another physician, who had performed a post mortem and had examined her, was then asked as to whether or not in his opinion the wound to uterus could have been self-inflicted. This constituted the controversy.   This was objected to because it was said that it was an invasion of the province of the jury.   The court, in dealing with the question, said this:

"It is true that a wound may be so situated that the practicability of self-infliction is an inference which all men are competent to draw, requiring no peculiar knowledge or experience, and therefore not a proper subject of expert testimony.   But to draw such inference from this particular wound on the interior surface of the womb of the deceased plainly required peculiar knowledge and experience not common to the world, and therefore the opinion of an expert founded on such knowledge and experience is admissible."

And again, on the second branch of the subject, the court said:

"The testimony in the case, as appears from the record, was of such a nature that the question of the defendant's guilt might have wholly turned on the disputed fact of the self-infliction of the wound.   The defendant himself relied on the possibility of that fact existing as a principal hypothesis consistent with the evidence of his own innocence."

Returning to the case under consideration, touching the qualification of Dr. Drake to testify as an expert, it appeared from his testimony, which was uncontroverted, that he graduated from the Old University of Louisville, Ky., in 1911, and had been actively engaged in the practice

of medicine since that time, and had held the position of physician for the fire and police department of Memphis since 1913; that he attended Vanderbilt University Medical School three years before going to Louisville; that he served two years in the medical department of the army during the late war, being in France and Germany most of the time; that he was in the ambulance service, giving first-aid treatment to those who had been wounded; that he had had considerable experience with bullets, had taken them out, and had seen them after they had been discharged from pistols. And he exhibited a bullet taken from the body of Mrs. Moon, which he stated was of .38 caliber.

The question with which we are concerned therefore, is whether the jurors who passed upon the guilt of the defendant were as competent to form an opinion as to whether Mrs. Moon could have shot herself as was Dr. Drake?

In *McCravy et al.* v. *State,* supra, the court said: "While a stocky built, fleshy person could not without difficulty reach around and fire a shot into the left side of the head, it is very apparent to us that a slender person could do so, and we see no reason why such person could not also fire through the left arm at the same time. Mrs. McCravy may have used her left arm to shield her face from the fire of the pistol."

It should be borne in mind that only one bullet passed through Mrs. McCravy's head, and that she was present at the trial of her husband and testified as a witness. If the location of the wound had been pointed out to the jury, with Mrs. McCravy present, so that the jury could observe her size and build, the length of her arms, and her physical strength to handle a pistol like the one with which she was shot, there was ample basis for saying that the

jurors were as well qualified to judge of her physical ability to shoot herself as was Dr. Myers.

In that case Mrs. McCravy testified that she knew how to fire the pistol, and that she had previously fired it. Furthermore, she could have turned her head to the right without turning her body, and thus have made it easier to have fired the pistol with her right hand.

The case under consideration is quite different in its facts, and the jury were not nearly so competent to form an opinion upon the question involved as was Dr. Drake. Mrs. Moon was not before the jury. Probably none of them had even seen her. The doctor could not put his finger on the wound so that the jury could see just where the bullets entered and where they made their exit. There were three of these wounds, and no two bullets took exactly the same course. There was no evidence before the jury as to the size or weight of deceased or as to the length of her arms. Dr. Drake had carefully examined Mrs. Moon's body at Collin's undertaking establishment. He had the body, with the wounds upon it, right before his eyes. He observed the points where the bullets entered, the course they took, and the places of exit. He was accustomed to examining wounds of this nature. He was familiar with the various organs of the body, and of their relation to each other. Mrs. Moon had never seen the pistol with which she was shot before. There is no evidence that she had ever shot a pistol, or had one in her hand, or knew anything about the use of firearms. While the jury might have formed some kind of a mental picture of this shooting, upon the introduction of evidence as to these various matters, it is self-evident that they were not nearly so well qualified to pass upon this question as was Dr. Drake. We

have carefully examined the clothes of Mrs. Moon, and have taken the pistol with which she was killed, and, with all the evidence in mind, have undertaken to determine whether it was possible for Mrs. Moon to have shot herself, and in deciding this matter we have done so upon the theory that she was slim, and, to our minds, it was physically impossible for her to have fired the three shots into her body.

Objection to this testimony by Dr. Drake was not interposed until after he had answered the question, when counsel for the defendant asked the court to withdraw the evidence from the jury.

It is contended by the state that the motion to have the evidence withdrawn came too late.

To this we cannot assent. It is well settled by our decisions that a party adversely affected by the introduction of incompetent testimony may move to have same excluded any time before the jury retires to consider its verdict, provided, of course, he has not waived his right to have it withdrawn. *Price* v. *Allen,* 9 Humph., 703; *Creed* v. *White,* 11 Humph., 549; *Carper* v. *Barnes,* 4 Sneed, 452; *Birchfield* v. *Russell,* 3 Cold., 229.

Taking up the fifth assignment of error, by which it is insisted that, as a matter of law and a scientific fact, of which the court takes judicial knowledge, that it is not a physical impossibility for a person, who has been wounded in the heart, to live some time afterward, and to fire shots from a revolver after receiving the wound through the heart which resulted in his death, and because it was an invasion of the province of the jury:

In Witthaus & Becker on Medical Jurisprudence and Forensic Medicine, vol. 2, pp. 121 and 123, it is said:

"Wounds of the heart are among the most fatal. Although it was once considered, and is now usually thought by laymen, that penetrating wounds to the heart must be necessarily instantly fatal, the facts are otherwise. . . . Therefore, as stated above, after a wound to the heart the patient does not, as a rule, die immediately, as formerly and often at the present time erroneously supposed. . . . The fact that death does not, as a rule, occur immediately after penetrating wounds to the heart is also of importance in medical jurisprudence, for upon it may hang the solution of questions of murder, suicide, or justifiable homicide."

And in *Mahon* v. *State,* 127 Tenn., 555, 156 S. W., 463, this court said:

"Upon the authorities it is not a physical impossibility for the deceased to have been wounded in a ventricle of the heart and have lived some time afterwards."

In that case the court found as a fact that after Mr. Dickson had been shot he fired his pistol twice and lived some minutes thereafter. It was further stated:

"The shot entered the body two inches above the heart and a little to the left of the nipple line. The ball ranged backwards and downwards at an angle of probably forty-five degrees and slightly inwards, and imbedded itself in the back between one and two inches to the left of the spine, and about the twelfth rib. The ball penetrated the left ventricle of the heart and the lower lobe of the left lung."

It will thus be seen that the ball did not penetrate the heart, but did penetrate one of the posterior chambers, or the ventricle of the heart.

Upon this question counsel for defendant in their brief say:

146 Tenn.—24

"If the courts take judicial cognizance of the fact that a person shot through the heart may fire another shot, then to permit a witness to swear differently is to allow testimony which the law denounces as erroneous, incorrect, and untrue."

The fallacy of the foregoing statement is found in the suggestion that the courts will take judicial knowledge "that a person shot through the heart may fire another shot." The court might take judicial knowledge that such a wound is not necessarily instantly fatal, but the court cannot judicially know that a person so wounded, even though alive, possesses sufficient consciousness and physical control of his hand to fire a pistol. This is a question which a layman cannot answer, and about which, as a rule, he is ignorant, and in such a case we consider it proper for an expert, who has a superior knowledge of the anatomy of man and of the effects of wounds inflicted upon the heart, to give his opinion.

In view of the competency of this evidence, and there being nothing in the record to contradict it, it necessarily follows that the defendant is guilty, and, even though the evidence made the basis of assignment No. 4 was incompetent, we cannot say that it was prejudicial. Both of these assignments will therefore be overruled.

In their written argument counsel do not refer to the sixth assignment of error, and we assume that they have abandoned same, and will not, therefore, lengthen this opinion by copying same and commenting upon it. We have considered it, however, and find it without merit.

The seventh assignment of error is as follows:

"The court erred in the following particulars, to wit: During the course of the trial the following proceedings were had:

" 'Gen. Glankler: If the court please, we want to introduce this subpoena in evidence, subpoena issued on the 7th day of September, 1921, for Mrs. W. H. Williams, the wife of the witness who was on the stand.

" 'The Court: He testified she had died.

" 'Mr. Bell: That is not admissible. This witness is dead, and that is inadmissible.

" 'The Court: It is part of the record.

" 'Mr. Bell: I object to its introduction, and we except to the action of the court.

" 'The Court: Note your exception. It is part of the record in the case, the return properly made by the sheriff.'

"This testimony was inadmissible and prejudicial in that it was intended to have the jury draw the inference that, if Mrs. Williams had not died, she would have been a witness against the defendant, and that her testimony would have been very injurious to the defendant. It imported an insinuation, an innuendo, which the defendant by cross-examination or otherwise could not combat, and further the court invaded the province of the jury as correctness of sheriff's return."

There is no merit in this contention. The defendant admits that he procured the pistol from Mrs. Williams by stating to her that her husband sent him after it. There is nothing in the record to indicate that, had Mrs. Williams been introduced as a witness, she could have given any evidence against the defendant further than that contained in his admission. He was therefore in no wise prejudiced by the introduction of this subpoena.

The eighth assignment of error is as follows:

"The court erred in not permitting the witness Sid Davis to testify on direct examination that, while he was carry-

ing the defendant to the hospital, the defendant was in a semiconscious condition, and as to the statements that the defendant made while in that condition, and it being agreed that the witness would have testified that while in that semiconscious condition the defendant repeatedly said: 'She shot herself; she shot herself; she shot herself.' The ruling of the court in this regard was erroneous and highly prejudicial to the defendant. The statement made by the defendant, if made under such circumstances that it could not have been deliberately made and could not have been self-serving, was admissible, and if the defendant was not conscious, but only semiconscious, the first statement which he made when in that condition was not self-serving, but a verbal act which was admissible."

According to the contention of the defendant, this statement to the ambulance driver was made some time after the shooting, and was not, therefore, admissible as a part of the res *gestae*. That is the only theory upon which it could have been admitted. If the defendant were not conscious and at himself, when he made this statement, then under no rule of evidence was it admissible. If he were conscious, then it would be incompetent because a self-serving declaration.

The ninth assignment of error assails the action of the court in refusing a new trial because of newly discovered evidence contained in affidavits of certain, witnesses introduced on the motion for a new trial to the effect that on the afternoon of the tragedy they heard some pistol shots out on Summer avenue, and saw an automobile after the shots were fired driving at a rapid rate in the direction of the city.

As previously stated, the question as to where the shots were fired is immaterial, and this new evidence throws no light upon any material issue, and could be of no benefit to the defendant.

The tenth assignment of error is as follows:

"Because the trial judge did not charge all of the law of the case, in that he failed to charge the jury the law of circumstantial evidence, and, this being a capital case and one wholly dependent upon circumstantial evidence, it was his duty to charge the law of circumstantial evidence, and all the law of the case, and the defendant was entitled to have the law governing the reception of circumstantial evidence, the strength required of the circumstances to exclude every other reasonable hypothesis other than the guilt of the defendant before the jury was warranted in convicting upon circumstantial evidence."

There might be some merit in this contention provided this was a case of purely circumstantial evidence; but such is not the fact. We have the positive evidence of a confession made by the defendant to the witness Hearen to the effect that he had killed his wife, supported by circumstantial evidence.

Counsel for the defendant rely upon the case of *Barnards* v. *State,* 88 Tenn., 183, 12 S. W., 431. In that case it was said:

"This charge is not assailed as unsound or inaccurate, so far as it goes, but the earnest contention is that the court should have gone further, and told the jury, in substance, that to convict the defendants in this case the proof must be so clear and convincing as to exclude every other reasonable hypothesis than that of their guilt, and that this must be true as to each and every one of them.

"It is well-settled law that such additional instruction must be given where the guilt of the accused is sought to be established upon circumstantial evidence only, and that, too, notwithstanding the doctrine of reasonable doubt be already embraced in the charge. . . .

"Though it is a well-established and just practice, we do not think the rule applicable to the case before us, because the guilt of the defendants does not depend alone on circumstantial evidence. Such is not the dependence of the state as to any one of them. That it is such a case as to 'Big John' is, of course, not insisted, for he confesses that he fired six or seven shots. That it is not such a case as to Anderson is equally clear. Mills says that he saw Anderson fire one time. To say that this statement of Mills is denied and shown to be untrue does not make it any the less direct testimony of the fact. The statement is not a mere circumstance tending to show the fact, but it is direct testimony of the fact itself. Whether it was true or not is quite another question, and that was for the jury to determine, under the rules with respect to conflicting evidence and the doctrine of reasonable doubt."

Upon the authority of the above case we do not consider this a case of purely circumstantial evidence, and this assignment is without merit. No special request was made for any additional instruction along the line complained of.

Defendant has been ably and efficiently represented by counsel. The case really involves but one question, and that is whether the defendant killed his wife, or whether she committed suicide. After very carefully weighing all the evidence, and considering the case from every angle, there is absolutely no doubt in our minds but that the defendant murdered his wife.

Moon v. State.

It is therefore the judgment of this court that the defendant be committed to the custody of the warden of the State penitentiary, to be kept by him safely within the walls of said penitentiary until Tuesday, August 15, 1922, at which time, and within lawful hours, he will put the defendant to death by electrocution in the manner prescribed by statute.