**STATE of Tennessee, Appellee,**

v.

**Jackie Lee ATKINS, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

July 26, 1984.

Certiorari Denied March 4, 1985.
See 105 S.Ct. 1395.

James D. Causey, Memphis, A. Wilson Wages, Millington, for appellant.

William M. Leech, Jr., Atty. Gen., Ann Lacy Johns, Asst. Atty. Gen., Nashville, Paul G. Summers, Dist. Atty., J. Kerry Blackwood, Asst. Dist. Atty., Somerville, for appellee.

## OPINION

TATUM, Judge.

The defendant, Jackie Lee Atkins, was convicted of first degree murder and sentenced to a life term in the State penitentiary. After considering the several issues presented, we conclude that the judgment of conviction must be affirmed.

We first address the issue attacking the sufficiency of the evidence. The defendant was convicted of the shooting death of his 28-year-old wife, Kimberley Dianne Atkins, on October 5, 1982. The defendant and the victim had been separated since June, 1982. The victim was a Petty Officer in the United States Navy stationed at the Naval facility at Millington. The defendant ran a Corvette repair shop in Millington. According to the victim's brother, Craig Knox, the defendant did not know the address or telephone number of the victim and telephoned him two times one day in September, 1982. On both occasions, he informed Craig Knox that he was going to kill the victim.

The victim's supervisor at the Naval Station was Janine Morgan. Between 2:15 and 2:20 P.M. on October 5, Ms. Morgan answered the telephone and recognized a voice that she had learned to be that of the defendant. The victim came to the telephone and after a conversation, the victim held the telephone so that Ms. Morgan could hear the defendant threaten to kill the victim. Ms. Morgan testified that she left the victim at the Naval station at about 2:50 P.M. on October 5. When Ms. Morgan left, the victim was in a "great mood."

She was "jolly and frolicking and she was going to get drunk." The victim was going to have her gun checked because it was jammed.

John Short testified that he knew both the defendant and the victim. Approximately two weeks before he heard of Kimberley Atkins' death, and while Mr. and Mrs. Atkins were separated, the witness was at the defendant's house trailer drinking beer with him. During a conversation, Mr. Short recalled the defendant stating with respect to his wife, "If the son of a bitch comes up here, I'll kill her."

Robert Curtis Rosenbush testified that he ran a gun shop in Millington and sold the victim a Walther PPKS pistol and ammunition. On October 5, 1982, at around 3:30 or 3:45 P.M., she brought the pistol to the store for repairs. The pistol had jammed. The victim waited about 35 minutes while the gun was repaired. While in the store, she bought a case for the pistol. He identified the gun case and box of 380 Winchester ammunition taken from victim's Corvette as items that he sold to the victim. When the victim left the gun store, she was very happy.

Randy Reed testified that he lived across the street from the defendant, with approximately 100 yards separating their houses. On October 5, Mr. Reed drove into his yard at 4:50 P.M. and got out of his truck. The defendant was standing at a blue Corvette in his yard and yelled for Mr. Reed to help him, saying that his wife had shot herself. Reed went into his house and told his wife to telephone the police and an ambulance. Reed looked out a window and saw the defendant at a red Corvette that he used for parts, located about 20 yards from the blue Corvette. The defendant had "something in his hand." At that point, Mr. Reed was distracted by his wife's telephone conversation and didn't see what the defendant did with the object in his hand.

Mr. Reed further testified that as he started out of his house, the defendant was at the door. They went together to view the victim in the blue Corvette and at the witness's suggestion, they went to the truck and waited for the ambulance to arrive. The ambulance arrived in 7 to 10 minutes. The defendant was not excited and appeared to be sober.

Howard Jerry and Gail Morgan, emergency medical technicians, testified that they arrived at the defendant's residence at approximately 5:52 P.M., responding to a call. As the witnesses and another technician drove into the driveway at the defendant's residence, they observed two men standing beside a truck, calmly conversing. The two men ignored the ambulance until the witnesses asked where they could locate the patient, then they were told "over there." When asked if they meant in the trailer, the men indicated that the "patient" was in a blue Corvette convertible parked at the trailer.

Howard Jerry was the first to examine the victim. When he first observed her in the driver's seat of the Corvette, she was slumped down. He observed an automatic pistol wedged between the driver's seat and the console. The barrel was pointing upward. Keys were on the console of the Corvette and a wine glass was between the victim's legs. The automatic pistol appeared to be jammed. The technicians removed the victim from the automobile to check her vital signs. It was immediately determined that the victim was dead and they observed an injury to her upper left chest. No spectators came to the scene.

Dr. Charles Warren Harlan, a forensic pathologist, testified that he conducted an autopsy on Kimberley Dianne Atkins. She died as a result of a near gunshot wound to the chest. The bullet entered at a point above the left nipple below the collarbone and exited at the rear of the right armpit. The bullet reentered the rear of the upper right arm and exited again above the right elbow. The entry wound was one-half inch higher than the exit wound in the back. There was stippling (flesh burned by hot lead and burning powder coming from the muzzle of the gun) around the entry to the chest wound. Dr. Harlan also testified that the autopsy revealed blue bruises to the right side of her neck, the back of her

left hand, the right thigh, and middle of the left shin. He found a brown bruise on her right shoulder and multiple brown bruises on the inside of both thighs. There was an abrasion on her right wrist and a pink contusion on the front of her right thigh.

There was stippling also found on the back of the left hand which was similar to that found at the entrance wound in the chest. The stippling on the hand was concentrated around the knuckles of the ring and little fingers.

Dr. Harlan was of the opinion that the muzzle of the pistol was between 0 and 9 inches, and probably between 3 and 5 inches, from the skin surface when the fatal shot was fired. The wound produced extensive bleeding in the chest. Blood was inhaled into the lungs. One would live less than 5 minutes with the wound inflicted.

Dr. Harlan was of the opinion that the wound was not self-inflicted. The straight line from the entry of the bullet at the left upper chest, exiting at the rear of the right arm pit with reentry into the upper arm and an exit above the right elbow, precludes the possibility that the pistol could be fired with the right hand. The stippling on the back of the left hand indicated that it was in front of the muzzle of the gun at the time of discharge, precluding the possibility that the gun was held in the left hand when discharged.

None of the officers or medical personnel were able to find either a shell casing or a spent bullet in the vicinity of the blue Corvette convertible. Nor was the victim's Walther PPKS automatic pistol ever found. Deputy Sheriff Jimmy Anderson, who arrived at the scene at 4:52 P.M., testified that he observed a glass on the floorboard, a green Navy pouch on the seat, a paper sack containing a bottle of wine, and a pistol wedged between the bucket seat and the console. Car keys were on the console. The green pouch from the seat of the car contained overnight clothes, dirty clothes, a box of 380 cartridges, a new gun pouch, and other items. There was another bottle of wine in the car which had not been opened. A cash register receipt indicated that the wine had been purchased at 3:09 P.M. The green gun pouch or case was empty but had the fresh smell of machine oil or WD–40.

TBI Agent Tony Bowers interviewed the defendant at approximately 7:30 P.M. The defendant had alcohol on his breath but appeared calm and rational. After waiving his *Miranda* rights, the defendant gave a written statement, saying:

"My wife's name is Kimberly (sic) Diane (sic) Atkins. We have been separated since the end of June. She is in the Navy at Millington. She has been living somewhere else in a house trailer. Last night, she came to my trailer and spent the night with me. She left this morning going to the base at ten minutes till 7:00. I worked on her car until 11:00 a.m. She came to my garage until about twenty minutes till 12:00. About 3:00 p.m., she called me from our trailer. I went on home after she called. When I got home, she was sitting inside drinking some Jack Daniels whiskey. I fixed myself a couple of drinks and she had a couple of drinks. We went outside and she shot her gun at a can. She started talking about killing herself. She walked outside and carried the 9 millimeter pistol, automatic, with her. I was sitting in my big green chair. I heard a shot. I jumped up and went to the window. I ran out the door and reached over in the car, it's a convertible and I grabbed her and tried to get her out. I ran across the street and tried to get Randy to get some help. He called the ambulance. I stayed over by the truck until the ambulance got there."

Agent Bowers testified that in the initial interview, the defendant said he had never before seen the pistol found in the victim's car. The defendant first said that he had not fired a gun within the 24 hours preceding the shooting, but after he was told a gun powder residue test would be taken, the defendant changed his story. He then said he and the victim had been target shooting. He also changed his story by saying that he recognized the pistol as that

belonging to his wife. The defendant then gave the aforesaid written statement. Agent Bowers was unable to locate the PPKS Walther 380 automatic pistol. The defendant denied any knowledge of it.

The pistol wedged between the driver's seat and console of the victim's automobile was a Smith & Wesson Model 39–2 nine millimeter semi-automatic pistol. It was examined by TBI Agent Tommy M. Heflin, an expert firearms examiner. When the pistol was received by Agent Heflin, there was a Remington Peters nine millimeter cartridge partially jammed in the chamber, holding the bolt open approximately one-half inch. The cartridge was tilted so that it could not feed into the chamber. After removing the jammed cartridge, the pistol was fired repeatedly without malfunction. When the gun is fired, the spent cartridge is ejected.

Agent Heflin examined the victim's T-shirt. Partially burned and burned gunpowder was heavily concentrated around the hole in the front upper left panel. No residue was found in a hole at the lower right armpit section. By test firing the gun at various distances for comparison of the gunpowder residue with that on the front of the T-shirt, Agent Heflin concluded that the fatal shot was not fired in direct contact with the T-shirt but was fired from less than 18 inches from it.

Dianne Conkoly, a TBI criminologist, testified that she analyzed gunshot residue kits with respect to both the victim and the defendant. One of the tests obtained from the defendant and both obtained from the victim revealed a significant concentration of elements indicative of gunshot residue, indicating that both the defendant and the victim could have fired or handled a gun.

The defendant did not testify but introduced two witnesses. Jerald Orman, a neighbor who lived one or two blocks away from the defendant's trailer, testified that he heard one gunshot. He subsequently saw the defendant running up the road hollering for Randy Reed to help him, saying, "My wife's been shot; come over here and help me." The defendant sounded upset and excited. Mr. Orman heard no screams, argument, or loud talking preceeding the gunshot.

Mr. Orman's wife, Lois Orman, testified that she had just left her mailbox when she heard a shot. She heard the defendant yell for Randy Reed to help, and thought she heard him say, "My wife's been shot." She could not hear Reed's response, but heard the defendant say, "Man, don't be that way." She heard nothing prior to hearing the gunshot.

In attacking the sufficiency of the evidence, the defendant insists that the circumstantial evidence does not exclude every reasonable hypothesis other than his guilt. He argues that the shooting could have been self-inflicted or inflicted by a third party. We think that the fatal wound could not have been self-inflicted for the reasons stated by Dr. Harlan. The evidence strongly infers that only the defendant and the victim were on the premises when the shooting occurred. This fact precludes a reasonable hypothesis that the fatal wound was inflicted by a third party.

The defendant also insists that there was no evidence of deliberation, premeditation, and malice and that the shooting could have been accidental. There was evidence that the defendant told the victim, her brother, and his friend that he intended to kill his wife. Immediately after the shooting, the defendant was cool and composed. He immediately represented to his neighbor and later to an investigating officer that his wife shot herself after threatening to do so. The Walther automatic pistol, which the victim had in her possession less than one hour before her death, was never found; nor were the shell casings and spent bullets ever found, even though no spectators tampered with the scene and the victim's newly purchased pouch for the missing pistol was still in her belongings. Immediately after the fatal shot was fired, the defendant was seen in the vicinity of a red junked Corvette with something in his hand. There was no one to remove these items other than the defendant.

Also significant is the defendant's theories or inconsistent statements regarding his and the victim's handling of guns on the afternoon of her death and the positive result of the gunpowder residue test conducted on the defendant. Another factor is that the victim was shot under the wheel of her car, under circumstances indicating that she was in the process of leaving the scene. Stipplings found on her left hand indicated an effort on her part to shield herself from the fatal bullet.

We think that the facts support the jury's finding that the defendant was guilty of first degree murder. Whether premeditation, deliberation, and malice are present in a given homicide case are questions of fact to be determined by the jury from all circumstances in evidence. *State v. Garland*, 617 S.W.2d 176 (Tenn.Crim. App.1981) and the cases therein cited. We find sufficient evidence upon which a rational trier of fact could be convinced beyond a reasonable doubt of the defendant's guilt of first degree murder. The evidence of guilt meets the standard required by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and Rule 13(e), T.R.A.P. This issue is without merit.

In another issue, the defendant says that the trial court erred in permitting Dr. Harlan to give expert testimony that the gunshot wound was not self-inflicted. The defendant cites *State v. McCravy*, 133 Tenn. 358, 181 S.W. 165 (1915) and *Moon v. State*, 146 Tenn. 319, 242 S.W. 39 (1922) for the proposition that expert opinion testimony is not admissible to establish the ultimate fact to be reached by the jury. Both of these cases dealt with the question of whether gunshot wounds could have been self-inflicted.

In *Bryant v. State*, 539 S.W.2d 816 (Tenn.Crim.App.1976), this court held that expert testimony of this nature did not invade the province of the jury, although the expert witness could not say whether the gunshot wound was self-inflicted. We think any question on this proposition has been resolved contrary to the holdings of the *McCravy* and *Moon* cases by the Tennessee Supreme Court in *City of Columbia v. C.F.W. Const. Co.*, 557 S.W.2d 734, 741, 742 (Tenn.1977). The court stated:

"In *National Life & Accident Insurance Co. v. Follett*, 168 Tenn. 647, 80 S.W.2d 92 (1935), this Court determined that where expert information is necessary for intelligent decision of an ultimate issue it does not matter that the opinion and one solution to the ultimate issue coincide. It is only when the trier of fact is as competent as the expert to determine an issue that the opinion of an expert has been held to be inadmissible, because unnecessary. See D. Paine, *Tennessee Law of Evidence* § 177 (1974). Moreover, in our view the better rule is that an expert's opinion is not objectionable merely because it embraces an ultimate issue to be decided by the trier of facts, so long as it is helpful to the court. See *Federal Rules of Evidence*, Rule 704. Accordingly, we conclude that it was error for the Chancellor to exclude the testimony of the expert in this instance."

Dr. Harlan was shown to be an experienced forensic pathologist and a medical examiner for Shelby County and the State of Tennessee. He actually performed the autopsy on the victim. When Dr. Harlan was asked his opinion as to whether the gunshot could have been self-inflicted, a jury-out hearing was held. Dr. Harlan testified that he had made between 400 and 500 determinations on whether a given wound was self-inflicted. His expertise included the effect of gunshot wounds on the human body as well as the mechanical limitations of the arms and hands. He described in detail how his determination was made, explaining the locations of the entrance and exit wounds, the path of the bullet, the location of stippling on the left hand and the entry wound to the chest, and all other pertinent details. Using the pistol, the doctor demonstrated that it was physically impossible for the deceased to have shot herself. The doctor's reasons for his opinion were clearly shown to the jury.

The allowance of expert testimony is within the discretion of the court. *Bryant v. State, supra.* It appeared to the trial judge, and we agree, that the evidence was helpful to the court. We think that the admission of this evidence was a sound exercise of the trial court's discretion.

■ In another issue, the defendant says that the court erred in restricting him to eight peremptory challenges. He insists that since he was indicted and tried for first degree murder, he was entitled to 15 peremptory challenges. Rule 24(d) of the Tennessee Rules of Criminal Procedure provides that if an offense is punishable by death, each defendant is entitled to 15 peremptory challenges. If the offense charged is punishable by imprisonment for more than 1 year, each defendant is entitled to 8 peremptory challenges. The trial judge granted the defendant only 8 challenges. We point out that the State did not ask for the death penalty in this case, nor was the death penalty issue submitted to the jury.

Our court, in dealing with this issue, has held that where the death penalty question is not to be submitted for the jury's consideration, then a defendant is entitled to only 8 peremptory challenges. *State v. John L. Bates,* No. 813, filed at Knoxville July 13, 1983 (unreported); *State v. David Carney,* No. 81–25A–III, filed at Nashville August 19, 1982 (unreported); *State v. Joseph Maurice Walker,* No. 80–225–III, filed at Nashville June 18, 1981 (unreported). Also see *Cheairs v. State,* 543 S.W.2d 70 (Tenn. Crim.App.1976); *Jenkins v. State,* 509 S.W.2d 240 (Tenn.Crim.App.1974). We adhere to these holdings.

The defendant next states that the trial court erred in failing to charge the jury on the lesser included offenses to murder in the first degree. The trial court charged the jury on first degree murder and second degree murder but did not instruct the jury on voluntary and involuntary manslaughter.

■ If there is any evidence reasonable minds could accept as to any such lesser offenses, the accused is entitled to appropriate instructions regarding the lesser offenses. *Johnson v. State,* 531 S.W.2d 558 (Tenn.1975); T.C.A. § 40–18–110(a). However, the practice of charging lesser included offenses where there is no evidence to support them, is not favored. *State v. Mellons,* 557 S.W.2d 497 (Tenn.1977); *Whitwell v. State,* 520 S.W.2d 338 (Tenn. 1975).

■ In this case, there was no evidence introduced by the defendant contradicting the State's evidence. Defendant did not testify but prior to trial told others that the victim committed suicide. It would have been pure speculation for the jury to have found that the defendant committed the offense upon a sudden heat produced by adequate provocation or that the defendant did not intend death nor bodily harm when he shot the victim, and that death was accidentally caused by some unlawful act or an act not unlawful in itself but done in an unlawful manner and without due caution. Since there was no evidence to support a finding of either degree of manslaughter, the trial judge did not err in failing to charge these offenses.

■ Moreover, the jury found the defendant to be guilty of "willful, deliberate, malicious, and premeditated killing," by finding him guilty of first degree murder instead of second degree murder. Having declined to convict the defendant of second degree murder, it would be folly to speculate that the jury might have found him guilty of manslaughter. If there was error, it was harmless.

Finally, the defendant complains that the trial judge erred in permitting TBI Agent Bowers to read from a report that the defendant refused to take a polygraph test and in declining to instruct the jury to disregard this evidence.

On direct examination, Agent Bowers testified that he interviewed the defendant at 7:30 P.M. on October 5, 1982, after advising him of his *Miranda* rights. The agent again interviewed the defendant at 8:30 P.M. when the previously quoted written

statement was obtained. The witness then described discrepancies between the two initial oral statements and the written statement given by the defendant.

On cross examination, defense counsel questioned the witness at length regarding the oral and written statements he obtained from the defendant. Defense counsel questioned the witness in detail concerning notes the witness made relating to the oral statements made by the defendant. The agent noted that defense counsel had been given a copy of his notes. Defense counsel obtained a typed copy of the notes which was passed to the witness and identified as a report submitted by the agent to the District Attorney General's office. Counsel was then shown a handwritten copy of the same notes which was made immediately after the witness talked with the defendant.

On redirect examination, the prosecutor sought to have the notes made an exhibit and admitted into evidence. Defense counsel made a general objection but failed to relate to the court that the notes contained a reference that the defendant refused to take a polygraph test until he talked with his lawyer.

After the note was read to the jury, defense counsel moved for a mistrial or for an admonition to the jury that the information contained in the report concerning the polygraph test not be considered. The trial judge ruled:

> "Mr. Causey (defense counsel), the Court allowed you to see the notes and to extract them from him with some trouble and see them and the question of the polygraph was not brought up before the Court prior to the reading and the Court allowed them because they had been brought out in cross-examination, so your motion for a mistrial and the motion to instruct the jury, will be overruled."

▮ In making the original objection, defense counsel owed a duty to inform the court that the notes contained the reference to the polygraph test. This fact was not known to the court when he originally ruled upon the objection. See *Patterson v.*

*State*, 184 Tenn. 39, 195 S.W.2d 26 (1946); *Cooper v. State*, 123 Tenn. 37, 138 S.W. 826 (Tenn.1911). Under these circumstances, the trial judge did not err in originally overruling the objection. Although the objection was not in proper form when contemporaneously made, we think that it would have been the better practice to admonish the jury to disregard this evidence. It is well settled that evidence is not admissible that a defendant declined to take a polygraph test. *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451 (1958). But, we do not find that the error, considering the whole record, more probably than not affected the judgment or resulted in prejudice to the judicial process. The agent's testimony that the defendant gave conflicting information is undisputed. As stated, the other substantial evidence of the defendant's guilt is undisputed. We find the evidence harmless beyond a reasonable doubt. See Rule 36(b), T.R.A.P.

It results that the judgment of the trial court is affirmed.

DAUGHTREY and SCOTT, JJ., concur.