IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 1998 SESSION

FILED

June 4, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. NO. 03C01-9704-CR-00144 |
| APPELLEE, | * | HAMILTON COUNTY |
| VS. | * | Hon. Stephen M. Bevil, Judge |
| HARVEY PHILLIP HESTER, | * | (Second Degree Murder–Two Counts; Attempted Second Degree Murder) |
| APPELLANT. | * | |

For Appellant:

Leonard M. Caputo
312 Vine Street
Chattanooga, TN 37403
(on appeal and at trial)

Leroy Phillips, Jr.
312 Vine Street
Chattanooga, TN 37403
(at trial)

For Appellee:

John Knox Walkup
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN 37243-0493

Michael J. Fahey, II
Assistant Attorney General
425 Fifth Avenue, North
Second Floor, Cordell Hull Building
Nashville, TN 37243-0488

Bates Bryan
Assistant District Attorney
600 Market Street
Courts Building
Chattanooga, TN 37402

OPINION FILED: _____

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

GARY R. WADE, JUDGE

## OPINION

The defendant, Harvey Phillip Hester, was convicted of two counts of second degree murder and one count of attempted second degree murder. The trial court imposed twenty-five-year terms for each murder conviction and a twelve-year term for the attempted second degree murder conviction. Because the three sentences are to be served consecutively, the effective sentence is sixty-two years. In this appeal of right, the defendant presents the following issues for our review:

> (I) whether the evidence is sufficient to support the convictions;
>
> (II) whether the trial court committed reversible error by refusing to charge vehicular homicide as a lesser grade offense of first degree murder;
>
> (III) whether prosecutorial misconduct occurring during the trial requires reversal;
>
> (IV) whether the trial court erred by allowing the blood alcohol test results of two of the victims to be admitted, where the individuals who conducted the tests were not called as witnesses; and
>
> (V) whether the trial court erred by imposing the maximum sentence for each conviction and by ordering the sentences to be served consecutively.

The trial court committed error by failing to instruct the jury on the lesser offense of vehicular homicide; thus, the second degree murder convictions are reversed and new trials ordered. The conviction and sentence for attempted second degree murder is affirmed.

On August 8, 1994, Richard Serna (Richard), his daughter, Angela, and his brother, Paul Serna (Paul), drove to the "blue hole" on Suck Creek Road at Signal Mountain to swim. Upon their arrival, the defendant was in the parking lot. Richard Serna briefly engaged in friendly conversation with the defendant after which the Sernas walked to the swimming area. Sometime later, the defendant

2

approached them and asked if they had seen his wallet. The defendant searched unsuccessfully for his wallet and then left. Angela described this exchange as "pleasant."

About five minutes later, the defendant returned and again inquired about his wallet. He pointed out that the Sernas were the only others in the area and explained that his wallet contained around $2,200. The defendant left but soon returned and insisted his wallet had to "be here somewhere." When he mentioned that he had a gun in his car, the Sernas were surprised. Paul placed a knife in his pocket but made no threats to the defendant.

After the defendant left, the Sernas gathered their belongings and returned to their car. When they reached the parking lot, the defendant asked permission to search. While the Sernas allowed a search, the defendant did not find his wallet. The Sernas then drove away. After driving on a short distance, the Sernas noted the defendant was following them. He rammed the back of their car several times and, at one point, the Sernas' car "fishtailed" around a bigger truck.

At trial, Angela testified that the defendant struck their vehicle in the rear "over and over again ... continuously the whole way down the mountain." She estimated that their vehicle was struck more than twenty times. As their car passed by the Suck Creek Boat Ramp, Angela yelled out the window asking for someone to call the police.

She recalled that at the bottom of the mountain, Suck Creek Road terminates at its intersection with Signal Mountain Boulevard, a four-lane road. She remembered that the defendant rammed their car into the four-lane road. At

3

another intersection, only a short distance away, Richard and Paul Serna stopped their vehicle and confronted the defendant. Paul drew his knife from his pocket but held it to his side. Angela testified that an argument ensued about the wallet but that her next memory was waking up in the hospital. Initially unable to recognize her mother, Angela Serna had suffered a broken pelvic bone and a broken leg. All of her facial bones were broken. She required bone graft surgery on her nose.

James Pilkington, who observed the confrontation at the intersection of Mountain Creek Road and Signal Mountain Boulevard, testified that the Sernas appeared to be frightened. When Pilkington stopped at a nearby Conoco to call the police, he noticed the Sernas' vehicle drive by and thought the altercation might have ended. When he drove around a curve, however, he saw that the Sernas had been involved in a wreck.

Mark Payne, who also saw the confrontation between the Sernas and the defendant at the intersection of Signal Mountain Boulevard and Mountain Creek Road, testified that either Richard or Paul was standing on the side of the road with a terrified look on his face. He saw that individual run and then observed the driver of the Serna vehicle stop to allow him to enter. The defendant's vehicle "shot right through the light and started chasing [the Sernas] Nissan." Payne described the defendant as "chasing [the victims] down." Michael Eugene Hood, who also witnessed the confrontation at the intersection, corroborated Payne's version of the events.

James DeSha, who was traveling on Signal Mountain Boulevard on the day of the wreck, testified that he saw a white Cutlass ram a red Nissan Pulsar on two occasions. He also saw the Cutlass move to the outside lane to the right

4

side of the Nissan and "turned in on him," ramming into the back bumper of the Nissan, spinning it sideways. He recalled that the Sernas' Nissan slid sideways, became airborne, flew across a red Thunderbird, and onto the hood of a green Dodge. DeSha claimed that the defendant, who was driving the Cutlass, grinned as he drove away at a high rate of speed. DeSha was able to get the license plate number of the Cutlass.

Officer Charles Russell of the Chattanooga Police Department investigated the accident. He found three cars with "a considerable amount of damage." The victims' car contained several beer cans. At approximately 1:00 A.M. the day after the wreck, he located the Cutlass driven by the defendant. The license tags had been removed. While there were no dents to the front of the defendant's car, the front right fender did have a presence of red paint, the color of the Serna vehicle. The defendant, who had suffered a black eye, voluntarily turned himself in to police.

Dr. Charles Harlan performed an autopsy on Paul Serna. Death resulted from a ring fracture of C-1 and C-2 cervical vertebrae, which is the area where the skull fits on to the vertebral column. His blood alcohol content was .03 percent, which indicated he had consumed less than two units of alcohol.

Richard Serna, who had a blood alcohol content of .032 percent, was a quadriplegic due to the brain injuries suffered in the accident. He died on January 20, 1995, several months after the car wreck. According to Dr. Frank King, the Hamilton County Medical Examiner, the cause of death was "acute bronchial pneumonia due to chronic medical debilitation due to head injury."

5

Attorney Joe McBrien, who represented the defendant in a civil case, appeared as a defense witness. He testified that the defendant had received a settlement award of $3518.75 six days before this incident. He recalled that the defendant received cash in that amount.

John Hackney, who lived at the foot of Suck Creek Mountain, was traveling to his residence on the day of the wreck, when he passed a car and then saw a billfold "blow up in the air." He stopped his vehicle and found the billfold and large denominations of cash lying on the ground. He testified that he picked everything up and left. The identification in the billfold was that of the defendant. Hackney admitted that he kept the money. He burned the wallet. He conceded that he had bragged to his co-workers about finding the cash, which is how the defense attorneys eventually located him. He acknowledged that he never notified the police about finding the wallet.

Terry Thurman, who testified through an interpreter, recalled that she saw the defendant and the victims in a confrontation at an intersection on Signal Mountain Boulevard. She observed one of the Serna men holding a knife up in the air.

David Blackburn testified that he was with the defendant at the time of the wreck. An individual named John and a girl whose name he could not recall were also present. Blackburn recalled that the defendant had a large amount of money in his possession before they went to the swimming hole. Blackburn testified that he separated from the defendant and then saw him in the parking lot. His eye was swelling shut and his nose or mouth was "busted." The defendant claimed that the people pulling away in another car had just robbed him.

Blackburn testified that the defendant followed the Sernas down the mountain and bumped their car several times. When they reached Signal Mountain Boulevard, the defendant and John got out of their vehicle. He saw one of the Sernas approach waving a knife; when the Sernas returned to their vehicle, the defendant continued to follow them. Blackburn testified that he suggested that the defendant continue to follow so they could eventually call the police. Blackburn claimed that the driver of the Nissan kept swerving in and out in an attempt to keep the defendant from driving alongside. He testified that after the accident, the defendant drove him to his car. Blackburn was charged with "accessory after the fact" but the charges were dismissed. He acknowledged prior convictions for theft, robbery, and drug-related offenses.

I

The defendant first argues the evidence is insufficient to support the verdict. He argues the proof would at most establish vehicular homicide or vehicular assault.

On appeal, the state is entitled to the strongest legitimate view of the trial testimony and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

Second degree murder is defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our code defines "knowing" conduct as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

A person engages in criminal attempt when he acts with the degree of culpability otherwise required and "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

In our view, there is sufficient evidence to support both of the second degree murder convictions as well as the attempted second degree murder conviction. Angela Serna testified the defendant rammed their vehicle more than twenty times. At one point, the defendant rammed the Serna vehicle, causing it to fishtail around an on-coming truck. DeSha testified that the defendant forced the Serna vehicle to slide into the path of a Thunderbird, thereby causing the injuries to its occupants. There was evidence that the defendant then fled the scene traveling at a high rate of speed. Obviously, the jury accredited the testimony of the state witnesses.

8

Second degree murder does not require an intentional killing. All that is required is that the defendant "is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Here, the defendant was able to appreciate the dangers caused by his conduct. Even though the Sernas' vehicle had almost collided with a truck just before the fatal wreck, the defendant continued to ram the victims' vehicle from the rear and the side.

II

A significant question is whether the trial court committed reversible error by refusing to charge vehicular homicide as a lesser offense of first degree murder. First degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide were all charged to the jury. The defendant requested an instruction on vehicular homicide. The trial court ruled as follows:

> [A]lthough I think the facts in this case could possibly support a charge to the jury on vehicular homicide, there is nothing, no language in the indictment which charges the offense of vehicular homicide, and it is a separate offense, this Court is not going to charge vehicular homicide.

The state argues any error by failing to charge vehicular homicide qualifies as harmless error.

The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). It is settled law that when "there are any facts that are susceptible of inferring guilt of any lesser included offense or offenses, then there is a mandatory duty upon the trial judge to charge on such offense or offenses. Failure to do so denies a defendant his constitutional right of trial by a jury." State v. Wright, 618 S.W.2d 310, 315 (Tenn. Crim. App. 1981) (citations omitted); Tenn. Code Ann. §

9

40-18-110(a).  When there is a trial on a single charge of a felony, there is also a trial on all lesser offenses, "as the facts may be."  Strader v. State, 362 S.W.2d 224, 227 (Tenn. 1962).  Trial courts, however, are not required to charge the jury on a lesser included offense when the record is devoid of evidence to support an inference of guilt of the lesser offense.  State v. Stephenson, 878 S.W.2d 530, 549-50 (Tenn. 1994); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990);  State v. Dulsworth, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989).

Trial judges should instruct on lesser offenses charged in the indictment whether requested to do so or not.  Tenn. Code Ann. § 40-18-110(a).  Failure to instruct on a lesser offense denies a defendant his constitutional right to trial by jury.  Wright, 618 S.W.2d at 315.

In State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996), our supreme court ruled as follows:

> Tennessee law recognizes two types of lesser offenses that may be included in the offense charged in the indictment: offenses necessarily included in the indictment and offenses that are lesser grades of the charged offense.  An offense is "necessarily included in the indictment ... only if the elements of the included offense are a subset of the elements of the charged offense and only if the greater offense cannot be committed without also committing the lesser offense."

Id.

Our supreme court also provided guidance on how to determine whether an offense is a lesser grade or class of the offense charged:  "[o]ne need only look to the statutes to determine whether a given offense is a lesser grade or class of the crime charged."  Id. at 310.  The court observed that the legislature has divided criminal homicide "into the grades of first-degree murder, second-degree

10

murder, voluntary manslaughter, criminally negligent homicide, and vehicular homicide." Id. Our statutory law, section 39-13-201, Tenn. Code Ann., established the grades of homicide recognized when the defendant committed these crimes: "criminal homicide is the unlawful killing of another person which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide or vehicular homicide."

Voluntary manslaughter is a lesser grade of first degree murder. It is not a lesser included offense because manslaughter contains elements that are not found in first degree murder. It is a lesser grade offense, however, pursuant to statute. Trusty, 919 S.W.2d at 311.

Vehicular homicide, like manslaughter, is not an offense necessarily included in the indictment charging premeditated first degree murder; however, under the guidelines established by our supreme court, we are compelled to recognize that vehicular homicide is a lesser grade offense of first-degree murder. In Trusty, our supreme court held unequivocally that "defendants are entitled to jury instructions on all lesser included offenses ... and on all offenses which are a lesser grade or class of the charged offense." Id. at 311.

Here, the defendant was charged with first degree murder. The lesser offenses of second degree murder, voluntary manslaughter, reckless homicide, and negligent homicide were properly included in the jury charge. Vehicular homicide, a lesser grade of first degree murder, was not. A Class C felony, it is defined as "a reckless killing of another by the operation of an automobile ...: [a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person." Tenn. Code Ann. § 39-13-213(a).

11

The defendant argues the "facts in this case clearly required the Court to charge the jury as to the issue of vehicular homicide." He also submits that "the entire State's case [] was based upon the fact that [the defendant] killed ... two men ... and injured the young lady ... by the use of his automobile in a manner such as to create a substantial risk of death or serious bodily injury to the victims." Under the facts presented at trial, it is plausible that the jury could have determined the victims' deaths resulted from the substantial, unjustified risks taken by the defendant. The defense theory was that the Sernas had committed a robbery and the defendant was attempting to force them to stop their vehicle. The defendant claimed that his collision with the Serna vehicle was minor.

Although the evidence is sufficient to support the second degree murder convictions, there were facts that could have been classified as a reckless killing of another by the operation of an automobile as the result of "conduct creating a substantial risk of death or serious bodily injury." Tenn. Code Ann. § 39-13-213(a). Those facts might have warranted a conviction for vehicular homicide. As the trial judge acknowledged, the facts of this case warranted an instruction on vehicular homicide. His concern about the form of the indictment was without basis. Because vehicular homicide is a lesser grade offense of first-degree murder, the jury should have been allowed to consider that option. Tenn. Code Ann. § 40-18-110; Trusty, 919 S.W.2d at 310.

We now address the state's argument that the court's failure to charge vehicular homicide was harmless error. The state makes the following argument as to why the error is harmless:

> Error associated with a trial court's failure to
> charge a lesser offense is harmless when the jury finds
> the defendant guilty of the greater offense and rejects
> other lesser offenses that are greater offenses than the

12

one requested and were included in the instructions.  In this case, the jury rejected the offense of voluntary manslaughter which is a greater offense than vehicular homicide.  Thus, the failure to instruct on vehicular homicide is harmless.

It is true that failure to instruct a lesser offense may be harmless when the jury finds the defendant guilty of the greater offense and rejects other lesser included offenses that are greater offenses than the one requested.  State v. Atkins, 681 S.W.2d 571, 577 (Tenn. Crim. App. 1984).  That is not, however, the case in this instance.  Voluntary manslaughter is not a greater offense than vehicular homicide; both offenses are Class C felonies.  See Tenn. Code Ann. § 39-13-211, -213.  Each offense is of an equal grade and includes a Range I sentence of three to six years.  Tenn. Code Ann. § 40-35-112(a)(3).

That the jury rejected voluntary manslaughter does not lead to the inevitable conclusion that the jury would have also rejected vehicular homicide.  It is likely that the jury concluded there was not adequate provocation on the part of the victims to return a verdict of voluntary manslaughter.  The state made a compelling argument that there was no justification for the defendant's conduct and that his claim that he was robbed and assaulted by the Sernas was not credible.  The prosecution asked, "Are these lives worth more than ... $2,200?  That's what this trial is about."  The state contended that a robbery, if one occurred, would not justify the actions of the defendant.  A determination that there was not provocation would not have foreclosed a vehicular homicide verdict.

That the jury convicted of second degree murder suggests the jury did not wholeheartedly embrace the first degree murder theory of the state.  The harmless error analysis approved in Atkins was applied to an indictment for first

13

degree murder, a conviction for first degree murder, and the failure of the trial judge to charge voluntary or involuntary manslaughter.[1]  Atkins, 681 S.W.2d at 572.  This court ruled first, there was no evidence to support a manslaughter instruction, and secondly, the rejection of second degree murder would foreclose the possibility of a lesser grade offense.  Id. at 577.

In Whitmore, the defendant was indicted in separate counts with premeditated murder and felony murder.  The jury convicted on both counts and declined to return a verdict on second degree murder or voluntary manslaughter.  This court found that the failure to charge criminally negligent homicide was harmless.  State v. Frank Whitmore, No. 03C01-9404-CR-00141, slip op. at 33 (Tenn. Crim. App., at Knoxville, June 19, 1997), perm. to app. filed, Aug. 20, 1997.  In each of these cases, the defendant was convicted of the highest offense charged and the jury rejected a lesser offense that was higher than the requested instruction.

The state also argues that the error was harmless because the jury was instructed on reckless homicide, a Class D felony.  The state contends the jury was allowed to consider but rejected the defendant's theory that the killings were reckless.  Again, we cannot agree.  The instruction on reckless homicide made no reference to the operation of a vehicle in a reckless manner.  Vehicular homicide necessarily requires the reckless use of a vehicle.  That the jury did not find a reckless homicide does not mean that the jury would not have found a reckless killing by the use of a vehicle.

---

[1]The law in effect when the Atkins homicide occurred defined manslaughter as "the unlawful killing of another without malice ... which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act."  Tenn. Code Ann. § 39-2-221 (repealed 1989).

The guiding principle is that if there is evidence in the record from which the jury could have concluded that the lesser included or grade of offense was committed, there must be an instruction for the lesser offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). To rule otherwise would effectively deprive any defendant of a jury trial on the lesser offense. That is a constitutional entitlement.

Recently, Judge Welles spoke for this court in its determination that an omission of a lesser included offense from the charge to the jury always requires a new trial. State v. Boyce, 920 S.W.2d 224, 227 (Tenn. Crim. App. 1995). The opinion included a quote from Poole v. State, 61 Tenn. 288, 294 (1872):

> However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of the offense. However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury.

Boyce, 922 S.W.2d at 227.

By refusing to charge the jury on vehicular homicide, the court invaded the province of the jury. The grade of homicide was a jury question. We cannot conclude the failure to charge it was harmless beyond a reasonable doubt. In consequence, the murder convictions must be reversed and remanded for a new trial.

The defendant also argues that the jury could have reasonably found that the defendant committed vehicular assault on Angela Serna. He implies that the trial court erred by failing to charge vehicular assault as a lesser offense of attempted first-degree murder. Yet, vehicular assault is not a lesser grade of

attempted first-degree murder. <u>Trusty</u>, 919 S.W.2d at 307. Nor is it a lesser offense necessarily included in the indictment. <u>Id.</u> The attempted second degree murder conviction is affirmed.

III

As his third issue, the defendant claims that the prosecutor was guilty of misconduct during the trial. The defendant complains that the prosecutor improperly "branded" a defense witness "as a thief and implied a totally false and improper theory" of the case. The defendant also argues the prosecutor improperly argued the jury was "to determine the value of life in this community."

One of the defense witnesses, David Blackburn, claimed that he was present during the incident and testified that he had seen the defendant with a large amount of cash in his wallet earlier in the day. On cross-examination, Blackburn admitted to having prior convictions for possession of marijuana for resale, theft under $500, and robbery. In a jury-out hearing, the trial court ruled that these prior convictions could be used only to "impeach[] his credibility."

In closing argument, however, the following exchange took place:

Prosecutor: What would be more reasonable? Would it be more reasonable that, let's say, someone who is a thief, a robber, a drug dealer who is out of work, and knows that his friend has some money to buy tires--

Defense Counsel: Excuse me. I object to his use of that in that manner. It was only admitted for credibility purposes, not for the purposes he's using it for.

***

Court: I'll sustain the objection to the term drug dealer.

Prosecutor: Is it more reasonable that thief friend of Mr. Hester, who had access to the wallet, took the wallet.

16

***

Prosecutor: Are these lives worth more than ... $2,200? That's what this trial is about. This trial is about do you want the kind of trials Mr. Hester offers? If everybody got that trial, Mr. Blackburn would have been killed years ago for his theft convictions.

Defense Counsel: Objection, Judge.

Court: Sustained. I'll sustain that objection. Ask the jury to disregard that last statement.

***

Prosecutor: Also, ... if you believe that the Sernas are traveling down the mountain and they throw that wallet out of their car, and behind this is Mr. Hester and his buddy Blackburn, who is out of work, and with his kind of record, and they don't stop and grab that wallet--

Defense Counsel: Objection. Again I object. He's using the record in an improper manner. It's only been admitted for one purpose.

Court: Sustain the objection.

***

Prosecutor: What is a human life worth in this county?

Defense counsel: Objection. That is totally improper.

Court: Sustained.

Our supreme court recently reaffirmed several well-established guidelines which control closing argument:

> We have recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. Nonetheless, closing argument is subject to the discretion of the trial judge, and must be temperate, predicated on evidence introduced during the trial, and relevant to the issues being tried.

State v. Ronnie Michael Cauthern, _____ S.W.2d _____, No. 02S01-9612-CC-00108, slip op. at 18 (Tenn., at Jackson, Mar. 23, 1998) (citations omitted).

17

The state's argument that Blackburn was a thief who took the wallet violated the trial court's admonishment that the prior convictions be used only for impeachment. The prosecutor argued that Blackburn, as a convicted felon, had a greater propensity to have committed the theft. See Tenn. R. Evid. 404.

The prosecutor's argument about the value of "human life in this county" was also improper. Appeals for the jury "to act as the community conscience are not necessarily impermissible." State v. Pulliam, 950 S.W.2d 360, 368 (Tenn. Crim. App. 1996), app. denied, (Tenn. 1997). In Pulliam, the court established the following guideline:

> The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers. The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice.

Id. (quoting United States v. Solivan, 937 F.2d 1146, 1154 (6th Cir.1991)). Because the arguments for the state about the value of a human life were designed to "inflame passion and prejudice," it exceeds the bounds of propriety.

In our assessment, however, any misconduct on the state's part did not affect the jury's verdict in this case. The test to be applied in reviewing a claim of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The factors, set out in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), and adopted by the Tennessee Supreme Court in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984), are as follows:

18

(1) the conduct complained of, viewed in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper statement;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength or weakness of the case.

While the conduct was inappropriate, the trial court sustained objections made by the defense and instructed the jury to disregard certain of the comments. For the most part, the prosecutor disregarded the ruling limiting the convictions to impeachment purposes. Because of his repeated refusal to comply with the trial court's orders, this factor weighs heavily for the defense. The cumulative effect of the misconduct was minimal. The final argument is a very small part of the record, only two pages out of a seven-hundred page transcript. Finally, the state presented a compelling case against the defendant. Regardless of whether there had been a theft, the defendant either recklessly or intentionally misused his vehicle in a manner that caused the death of two of the victims and serious injuries to a third. In our view, the misconduct had no effect on the verdict.

IV

The defendant next complains that the trial judge erred by allowing medical examiners, who had not administered the tests, to testify about the victims' blood alcohol content at the time of the wreck. He complains this amounts to inadmissible hearsay and violates his right to confront adverse witnesses.

During the cross-examination of Officer Russell, defense counsel established that a twelve-pack of beer may have been in the victims' automobile. Pictures of empty beer cans were also admitted into evidence. The state sought to admit medical records of the autopsy which indicated fairly low blood alcohol contents at the time of the wreck. The trial court ruled that defense counsel, by its reference to the victims' possession of alcohol, made the blood alcohol content relevant and that the test results were admissible under Tenn. R. Evid. 803(6), the "business records" exception to the hearsay rule.

Dr. King, who performed an autopsy on Richard Serna several months after the car wreck, testified that when he performs an autopsy, he reviews all medical records to determine the cause of death. Emergency room records indicated a .032 percent blood alcohol content. Dr. King admitted, however, that the victim's blood alcohol level at the time of the accident "played no role" in his determination of the cause of death.

Dr. Harlan testified that when he began performing the autopsy on Paul Serna, on August 9, 1994, he withdrew a sample of the victim's blood and arranged for the Tennessee Bureau of Investigation to conduct a blood alcohol analysis. The test registered a .03.

Hearsay, of course, is generally not admissible. Tenn. R. Evid. 802. It is defined as "a statement, other that one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). The "business records" exception to the hearsay rule provides as follows:

> Records of Regularly Conducted Activity.--A
> memorandum, report, record, or data compilation in any

form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

Medical records may fall within the business records exception, as long as the appropriate foundation is established. Witter v. Nesbit, 878 S.W.2d 116, 122 (Tenn. App. 1993). One authority states the rule as follows:

Their declarations are admissible insofar as pertinent to the regular course of hospital business. The jury can assume the nurse recorded [the patient's] words accurately. Likewise, the jury can take the doctor's diagnostic opinion as true .... The jury may also consider the lab test results as true.

Neil P. Cohen et al., Tennessee Law of Evidence, § 803(6).11, at 566 (3d ed. 1995).

Here, there was an inadequate foundation for Dr. King's testimony. The rule requires the "custodian [of the records] or other qualified witness." Tenn. R. Evid. 803(6). A witness is not qualified to lay the foundation unless he or she is "personally familiar with the business's record-keeping systems." Alexander v. Inman, 903 S.W.2d 686, 700 (Tenn. App. 1995) (emphasis added). The witness should also be "able to explain the record keeping procedures." Id.

Dr. King was not an employee of Erlanger Hospital, where the blood alcohol examinations on Richard Serna took place. No effort was made to show

21

that he had any first-hand knowledge of the record-keeping procedures at the hospital. Thus, the trial court erred by allowing Dr. King to testify to the test results under Tenn. R. Evid. 803(6). See Cobble v. McCamey, 790 S.W.2d 279, 283 (Tenn. App. 1989) ("[T]he purported business records cannot prove themselves").

Dr. Harlan's testimony should not have been admitted for different reasons. The test performed by the TBI was apparently conducted in anticipation of litigation. Generally, business records are reliable because "they are 'prepared for other use and only incidentally found pertinent to litigation.'" State v. Henderson, 554 S.W.2d 117, 120 (Tenn. 1977) (quoting People v. Hobson, 119 N.W.2d 581, 588 (Mich. 1963)). That does not appear to be the case here. Moreover, the state made no effort to establish a foundation for the admission of the record. Finally, Rule 803(3), which provides that public records are admissible, excludes "matters observed by police officers and other law enforcement personnel."

The United States Constitution provides the right "to be confronted with witnesses." U.S. Const. amend. VI. The Tennessee Constitution provides the right "to meet witnesses face to face." Tenn. Const. art. I, § 9. If interpreted literally, these clauses would bar admission of several different types of evidence which are exceptions to the hearsay rule. Ohio v. Roberts, 448 U.S. 56, 63 (1980). The United States Supreme Court has ruled, however, that the clause does not bar admission of evidence that "falls within a firmly rooted hearsay exception." Id. at 66. In Roberts, the court allowed an exception only upon a showing of (1) unavailability of the witness and (2) reliability. Id. Later, however, the Supreme Court ruled that "where the proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." White v. Illinois, 502 U.S. 346, 356 (1992).

22

In  Henderson, 554 S.W.2d at 119-20, our supreme court ruled that toxicology reports indicating the presence of illegal drugs could not be admitted through a witness other than the one that performed the test.  Our supreme court ruled that hearsay is inadmissible in a criminal trial unless (1)  the evidence is not crucial to proving the state's case; (2)  the witness is unavailable; and (3)  the evidence has its own indicia of reliability.  In Henderson, the court concluded the toxicologist's report could not be considered a business record because it was prepared in anticipation of litigation.  Id. at 120.  The court emphasized that the report was the only trial evidence establishing that the drugs were illegal.

This court has held that the Henderson test does not apply to statements that fall within a firmly rooted hearsay exception.  State v. Joseph T. Alley, No. 02C01-9405-CC-00100, slip op. at 6 (Tenn. Crim. App., at Jackson, June 18, 1997), app. denied (Tenn., Mar. 2, 1998).  See also State v. Kenneth Antonio Lillard, No. 01C01-9602-CC-00051 (Tenn. Crim. App., at Nashville, Feb. 12, 1997).

As early as 1874, the United State Supreme Court made mention of the "rule which governs the admissibility of entries made by private parties in the ordinary course of their business."  Chaffee v. United States, 85 U.S. 516, 541 (1873).  Federal courts have held the "business records" exception is firmly established.  United State v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989).  In Norton, the Eleventh Circuit Court made the following ruling:

> [W]e find the business records exception to the hearsay
> rule to be "firmly enough rooted in our jurisprudence" to
> satisfy the requirements of the Confrontation Clause
> where, as here, the document was properly admitted
> under the exception.  "Properly administered the
> business and public records exceptions would seem to
> be among the safest of the hearsay exceptions."

23

Id. (citations omitted).  Other federal courts have followed suit: "The business records exception is a firmly rooted hearsay exception ....  Therefore, if the records are admissible under the business records exception, no violation of the Confrontation Clause occurred."  United States v. Ismoila, 100 F.3d 380, 392 (5th Cir. 1996).

Tennessee courts have long recognized the business records exception.  Bolden v. State, 203 S.W. 755 (Tenn. 1918).  In Bolden, our supreme court explained the rationale for the "business records" exception: "They are receivable as original evidence, because they import trustworthiness, in that a motive to make the entries falsely is excluded."  In Lillard, this court ruled the "business records exception as set forth in T.R.E. 803(6) is a firmly rooted exception to the hearsay rule."  Slip op. at 5.

Had a proper foundation been laid, the results could have been admissible as business records without violating the defendant's right of confrontation.  As long as the records are "properly admitted," there is no violation. Norton, 867 F.2d at 1363.

The failure on the part of the state to establish a proper foundation for the evidence would not require reversal.  There was substantial evidence of the defendant's guilt.  The blood alcohol content of the victims was not a significant point.  There was no indication that that contributed to the car wreck.  The error, in our view, qualified as harmless.

V

As his final issue, the defendant complains that twenty-five (25) year sentences, the maximum possible, for each second degree murder, and the sentence of twelve years, the maximum, for the attempted second degree murder, were excessive. He also complains that the trial court erred by ordering all three sentences to be served consecutively.

When a challenge is made to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a "de novo review ... with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210.

At the time of this offense, the presumptive sentence was the minimum in the range if there were no enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210 (amended in 1995 changing the presumptive sentence for a Class A felony to the midpoint in the range). Should the trial court find mitigating and enhancement factors, it must start at the minimum sentence in the range and

25

enhance the sentence based upon any applicable enhancement factors, then reduce the sentence based upon any appropriate mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight given to each factor is within the trial court's discretion provided that the record supports its findings and it complies with the Sentencing Act. See State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The trial court, however, should make specific findings on the record which indicate its application of the sentencing principles. Tenn. Code Ann. §§ 40-35-209 and -210.

At the sentencing hearing, Michael Scott Serna, the brother of Richard and Paul Serna, testified that anything less than the "maximum sentence ran consecutive would be less than justice." He recalled that Richard weighed about one-hundred seventy pounds prior to the wreck and had dropped to eighty or ninety pounds as a result. He described his brother's pain as excruciating. He had to file bankruptcy because the medical bills amounted to "hundreds of thousands of dollars." He also asked the court to consider that Angela Serna would never be able to have children because of her injuries.

The presentence report established that the defendant, age twenty-four at the time of sentencing, completed eighth grade and acquired his G.E.D. A laborer, he has three children, ages four, three, and one. His prior criminal history included several thefts, simple assault, reckless driving, and failure to appear. He was on probation for theft at the time of these offenses.

The trial court found the following enhancement factors applicable to each offense:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1).

26

(2) The personal injuries inflicted upon the victim were great. Tenn. Code Ann. § 40-35-114(6).

(3) The defendant possessed or employed a deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-119(9).

(4) The defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10).

(5) The felony was committed while the defendant was on a form of release from a prior conviction. Tenn. Code Ann. § 40-35-114(13).

The defendant argues enhancement factor (10), no hesitation about committing a crime when the risk to human life was high, is an essential element of the offenses. The trial judge commented that he was applying this factor because the defendant endangered the lives of persons other than the victims. For that reason, we agree that this factor is applicable.

The Tennessee Criminal Sentencing Reform Act of 1989 provides that an enhancement factor may be applied if it is not an "essential element" of the offense. Tenn. Code Ann. § 40-35-114. The test for determining if an enhancement factor is an essential element of an offense is whether the same proof necessary to establish the enhancement factor would also establish an element of the offense. See State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

In State v. Bingham, 910 S.W.2d 448 (Tenn. 1995), our supreme court ruled that factor (10) may be used "where the defendant creates a high risk to the life of a person other than the victim." In Bingham, our supreme court upheld use of the factor in a vehicular homicide case, where the trial court found the defendant had driven recklessly on a busy four-lane road. Because the defendant's conduct

created a substantial risk of death to other drivers, the factor was appropriately applied.

In this case, the proof established that when the victims' vehicle wrecked, two other vehicles were involved and those drivers were placed directly in danger. Prior to the wreck, the defendant caused the victims' vehicle to "fishtail" around an oncoming truck. Clearly, others besides the victims were in danger due to the defendant's driving. This factor was appropriately applied.

The defendant also argues that enhancement factor (6), the personal injuries suffered by the victim, is inapplicable because it is an essential element of the offenses charged. Because this factor was an essential element of the crime, it should not have been applied to the murder convictions. State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987). It was, however, appropriately applied to the attempted second degree murder conviction. State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). "Particularly great injuries are not essential to the commission of this offense, but prove greater culpability." Id.

The defendant also contends that the trial court erred by refusing to apply the mitigating factor that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." Tenn. Code Ann. § 40-35-113(3). At the sentencing hearing, the trial court made no findings on any mitigating circumstances. In our view, this mitigating factor is entitled to little or no weight. Even if the Sernas assaulted the defendant and stole his wallet, that would not excuse the defendant's extended criminal conduct in chasing the victims for several miles and repeatedly ramming their vehicle.

28

Even if some evidence of mitigation did exist, enhancement factors present so strongly outweigh the mitigating factors that the maximum sentence on each offense would have been warranted.

We now turn to the appropriateness of consecutive sentencing. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution: "[C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[2] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who

---

[2]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).


In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, as now defined by subsection (b)(4) in the statute, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses.

In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict

factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Wilkerson, 905 S.W.2d at 938. The record must show that the sentencing principles and all relevant facts and circumstances were considered before the presumption of correctness applies.

The trial court found consecutive sentences were appropriate because the defendant was a dangerous offender. We agree. A reasonable inference from the proof is that the defendant purposefully followed the victims and rammed their vehicle repeatedly, fully aware that the conduct endangered not only the victims but the occupants of the other vehicles on the road. Moreover, the defendant's prior criminal record indicates an escalating pattern of criminal behavior. The defendant was on probation at the time he committed the present offenses. See Tenn. Code Ann. § 40-35-115(b)(6). Consecutive sentences are necessary to protect society from further misdeeds by the defendant.

Because the trial court failed to instruct the jury on all the possible lesser grades of offenses as required by law, we must reverse the second degree murder convictions and remand for a new trial. Otherwise, the judgment is affirmed.

_____
Gary R. Wade, Judge

CONCUR:

_____
William M. Barker, Judge


_____
Curwood Witt, Judge